67 A.3d 646

OZLEM KOSEOGLU, AS ADMINISTRATRIX OF THE ESTATE OF MATT S. KOSEOGLU, DECEASED, AS ADMINISTRATRIX AD PROSEQUENDUM FOR THE HEIRS-AT-LAW OF MATT KO-SEOGLU, DECEASED AND INDIVIDUALLY, PLAINTIFF–AP-PELLANT/CROSS–RESPONDENT, v. ANN WRY, M.D., DEFEN-DANT–RESPONDENT/CROSS–APPELLANT.

Superior Court of New Jersey
Appellate Division

Telephonically Argued December 20, 2012—Decided April 22, 2013.

144

Before Judges MESSANO, LIHOTZ and KENNEDY.

*John B. Collins* argued the cause for appellant/cross-respondent (*Bongiovanni, Collins & Warden, P.C.*, attorneys; *Mr. Collins*, on the brief).

*Philip F. Mattia* argued the cause for respondent/cross-appellant (*Mattia & McBride, P.C.*, attorneys; *Mr. Mattia*, on the brief).

The opinion of the court was delivered by

LIHOTZ, J.A.D.

The parties filed cross-appeals from the denial of their respective motions for judgment notwithstanding the verdict (JNOV) in this wrongful death action.[1] Plaintiff Ozlem Koseoglu, as administratrix and administratrix ad prosequendum for the estate of her late husband, Matt Koseoglu (decedent), appeals from the denial of her request to set aside as unsupported the jury's allocation of damages awarded on her professional negligence claims against defendant Ann Wry, M.D. Defendant argues the jury verdict must be set aside and the complaint dismissed because plaintiff failed to prove causation. After review of the parties' arguments, in light of the record and applicable law, we affirm the orders entered by Judge Rachelle L. Harz on September 9, 2011 denying the parties' motions. Consequently, the September 23, 2011 Amended Order for Judgment will not be disturbed.

I.

At trial, plaintiff related the facts and circumstances regarding decedent's condition prior to and on the date of his death. Decedent became ill on September 9, 2007, complaining he felt tired and had a fever. By September 12, his exhaustion persisted and

---

[1] Plaintiff also presented a survivorship claim that was dismissed, without objection, at the close of evidence.

his temperature had climbed to 103.6 degrees. Decedent also noticed white spots on his throat, felt weak and had no appetite.

Concerned for her husband's condition, plaintiff called defendant, the family's physician, and left a voicemail message explaining decedent's symptoms. Nidia Bedoya, a secretary at defendant's office, returned plaintiff's call around 12:30 p.m. Plaintiff restated decedent's symptoms and, after being placed on hold, again spoke to Bedoya, who explained she "spoke with Dr. Wry, they pulled out [decedent]'s file, and [Dr. Wry] told me that because he had similar symptoms back in January . . . they were going to prescribe him antibiotics, and that he should take that . . . to make him feel better."

According to plaintiff, Bedoya rejected her request for an appointment with Dr. Wry to examine decedent, stating, "Dr. Wry was very busy and had no openings for the day, and that she couldn't see him that day." Plaintiff asked to speak with defendant directly, but was told "Dr. Wry was busy seeing patients and couldn't come to the phone." An authorization for a prescription for Augmentin was recorded on decedent's chart maintained by defendant's office; however, the chart includes no record of plaintiff's call or any notation of decedent's symptoms.

Later that afternoon, decedent felt more energetic. He picked up his children from school and stopped by the pharmacy. However, by the time he returned home, between 4:00 and 4:30 p.m., he was pale and weak. Decedent bathed, ate soup, took the Augmentin, and went to sleep around 6:00 p.m.

Plaintiff checked on decedent at 8:30 p.m., discovered his feet and lips were blotchy and blue, and he was unresponsive. She called 9-1-1 and began cardiopulmonary resuscitation. Decedent was transported via ambulance to Saint Joseph's Hospital in Paterson, where he was pronounced dead.

An autopsy revealed decedent's cause of death was cardiac arrhythmia due to focal myocarditis of the right ventricle. Myocarditis is an inflammation of the heart muscle known to cause

cardiac arrhythmia, an electrical instability or abnormality of the heart. If a virus traveling in the bloodstream enters the heart muscle or myocardium, it can infect the heart, causing myocarditis. Typically, myocarditis is asymptomatic; sometimes, however, it is preceded by a viral syndrome, which may include body aches, fever, malaise, and fatigue, and may present symptoms such as chest pain, palpitations, tachycardia, arrhythmia, severe shortness of breath, and simple exhaustion. Focal myocarditis is limited to one, localized area of the heart, as contrasted with acute myocarditis, which is more widespread throughout the heart muscle.

The pathologist performing decedent's autopsy examined ten tissue samples from decedent's right heart ventricle and six from his left. Two samples from the right ventricle revealed limited inflammation causing focal necrosis, or "cell death." No inflammation was found on the left ventricle, supporting the pathologist's conclusion decedent suffered from focal myocarditis, rather than a widespread inflammation evincing diffuse myocarditis.

Bedoya's trial testimony explained the policy and practice of defendant's office. When patients called, they would be offered same-day appointments for sick visits, or "[i]f they couldn't be seen that day, they'd be offered an appointment for . . . the next day." Also, when a patient "start[ed] talking about their symptoms and going on, then they would be transferred to a nurse." Once a call was transferred to a nurse, Bedoya generally "wouldn't be involved." She also acknowledged defendant or a nurse would occasionally prescribe a medication over the phone without first examining the patient.

Bedoya had no recollection of this matter. She could not recall speaking with plaintiff, defendant, or a nurse on September 12, 2007, nor whether she had even worked on the day in question.

Defendant's testimony confirmed Bedoya's explanation of office policy regarding patient scheduling, and refuted any suggestion a patient requesting an office visit would be told time was unavailable. Defendant explained the facility "allotted time on a schedule" as a matter of practice, "in case someone called in that day"

to schedule a sick visit. Defendant asserted a patient presenting with a very high fever, fatigue, and body aches "would have been told to come in for an appointment[.]" Further, she noted Wednesday was her "late night," when she would stay "[a]nywhere from 6:30 to 7:30 [p.m.], occasionally, rarely, 8:00 [p.m.,]" thus allocating "even more time to accommodate sick visits" on that day of the week.

Defendant acknowledged decedent's file included a note written by Mary Patricia Donnalley, a nurse at the facility, which stated: "called [pharmacy for a] new [prescription] for Augmentin 875mg bid × 10 days # 20 no refills per Dr. Wry/M. Donnalley RNBS." Defendant testified she would prescribe antibiotics without examining a sick patient only "if the patient asked and couldn't come in[,]" when the patient was "going on a trip[,]" or "as a favor" when "someone pleaded f[or] one[.]"

Both parties also presented extensive expert medical testimony.[2] Plaintiff two experts discussed her contention defendant was negligent in failing to examine decedent, obtain a history of his symptoms, or diagnose his heart condition, which warranted follow-up hospital care. Defendant's three experts refuted the suggestion defendant's conduct contributed to decedent's death.

Plaintiff first presented Lionel Grossbard, M.D., an internist, whose practice was devoted primarily to hematology and oncology, not cardiology, with approximately ten to twenty percent devoted to internal medicine. Defendant objected to Dr. Grossbard "giving opinions about myocarditis[,] either its diagnosis or treatment[,]" asserting he lacked expertise on the subject. The court overruled the objection, concluding Dr. Grossbard held qualifications and foundational knowledge as an expert in the field of internal medicine, and the extent of his familiarity with myocarditis could be explored during cross-examination.

---

[2] Plaintiff also presented an expert economist regarding the economic loss, which we need not discuss.

After his review of the materials, Dr. Grossbard rejected the autopsy findings, instead concluding decedent died of viral myocarditis. Relying on plaintiff's description of events, he noted "patients with acute myocarditis in whom a myocarditis is due to a virus, there are several days of flulike symptoms[,]" preceding the onset of the disease.

Dr. Grossbard opined defendant deviated from the standard of care for a physician practicing internal medicine when she "prescribed an antibiotic over the phone without any professional speaking to [decedent,]" because the prescribed medication could "mask the underlying disease." Also, he opined defendant should have examined decedent in light of the expressed symptoms. Dr. Grossbard asserted a physical examination of decedent could have disclosed "certain abnormalities" pointing to a cardiac problem, such as an irregular heartbeat or rhythm, and possibly muffled sounds related to inflammation in the heart muscle. Once cardiac abnormalities were detected, a hospital referral for an electrocardiogram (EKG) and blood tests would follow and lead "to a diagnosis of a cardiac condition." Certain blood tests detect troponin, a chemical the heart releases when there is damage to the heart, which a "major hospital" will detect "generally in about 30 to 60 minutes[,]" then admit "the patient to the cardiac care unit." Dr. Grossbard reasoned had defendant examined decedent, the chain of events would follow such that "there [was] a very good chance, significantly greater than 50 percent," decedent would have survived. Dr. Grossbard concluded defendant's failure to speak to or examine decedent, under the circumstances increased the risk posed by the disease and was a significant contributing factor causing his death.

On cross-examination, Dr. Grossbard clarified his opinion, explaining he "never" opined defendant "should have" diagnosed decedent with myocarditis. Rather, he concluded the standard of care required defendant to speak to her patient to take a history of his symptoms and/or examine him. Dr. Grossbard also made clear that the individual acts of prescribing an antibiotic over the

phone and declining to talk to the patient if an office visit were offered, did not, standing alone, represent deviations; however, not talking to the patient and not offering an office visit breached the acceptable standard of care. Finally, he agreed "[i]f the patient were offered a visit and didn't come in, there would be no deviation" from the standard of care.

Dr. Grossbard also conceded myocarditis does not always present with an irregular heartbeat, electrocardiogram, abnormalities, or even flu-like symptoms of fever, body aches, and malaise. Further, he conceded the disease was typically difficult to diagnose because it was asymptomatic and insensitive to traditional diagnostic testing. He concurred with the proposition that not all patients suffering from myocarditis have abnormal EKGs and less than thirty-four percent demonstrate low troponin levels. Finally, he acknowledged a "high percentage" of sudden, unexpected deaths resulted from myocarditis.

Plaintiff also presented Gerald J. Melnick, M.D., an expert in emergency medicine. Dr. Melnick had formal training in the diagnosis and treatment of myocarditis during his one-year, post-medical school internship, and attended continuing medical education lectures on various cardiac pathologies, including myocarditis.

Defendant objected to Dr. Melnick's testimony on what the likely results of an EKG would have been, had defendant examined decedent and performed the test on September 12, 2007. The court overruled the objection, noting "it'll be up to the jury to determine the value to place on his testimony based upon his knowledge, skill, and training [i]n this particular area."

Dr. Melnick testified "to a reasonable degree of medical probability" that had decedent gone to an emergency room, he would have been tachycardic, which he was reasonably certain would have triggered the need for an EKG, revealing "evidence of the electrical problems from the inflammation[.]" Also, decedent "had significant muscle soreness and pain[,]" which would have alerted an emergency room physician that blood screening tests were

necessary. Because the autopsy reported "inflammation and ... a degree of ... cardiac muscle damage," Dr. Melnick projected blood tests likely would have shown elevated cardiac enzymes, including troponin. On cross-examination, Dr. Melnick, like Dr. Grossbard, conceded the diagnostic tests might not have led to the discovery of the myocarditis, because the condition commonly presents asymptomatically.

Defendant's first expert was Edward Julie, M.D., a cardiologist, whose testimony was limited to decedent's "clinical presentation and how it relates to the ultimate autopsy diagnosis of myocarditis." Although acknowledging decedent likely suffered from a systemic virus that traveled through his bloodstream to his heart that was possibly responsible for the myocarditis, Dr. Julie opined a cardiovascular examination of decedent "would have been normal" because decedent's physical complaints did not include "chest pain or shortness of breath or palpitations[,]" and the autopsy results showed "focal inflammation of the right ventricle in a very small area, [with] no generalized involvement of the heart." Dr. Julie maintained, not only would an exam fail to detect abnormalities, but also had he been examined, decedent's described symptoms would not have resulted in his hospitalization because they suggested he was suffering from a virus. Dr. Julie emphasized the autopsy results unequivocally showing focal myocarditis that involved only "a small degree" of the heart muscle's right ventricle. Consequently, he opined, decedent would not show "significant signs or symptoms" of heart disease; blood work would not have detected elevated troponin levels and an EKG, "would have been completely normal." Moreover, decedent's "cardiac sudden death by no means would have been prevented."

Kenneth M. Granet, M.D., an internist, next testified for the defense. Following his review of a document file, he asserted defendant complied with the acceptable standards of care because the "office procedures and policies in place .... offer[ed] somebody who was sick a visit." He also opined had decedent come into the office for an examination, his "constellation of symptoms"

would have supported a diagnosis of a virus and would not have led to further heart examination.

Defendant's final expert was Stephen Factor, M.D., an expert in the field of cardiovascular pathology. Dr. Factor analyzed the autopsy samples of decedent's heart. He concluded cardiac enzyme tests and an EKG would not have revealed the myocarditis "based on the limited extent of ... inflammation in the ... two out of ten pieces of myocardium from the right ventricle[.]" He explained "the diagnosis of myocarditis would not have been made clinically"; and even if it were, the outcome would be unchanged because decedent would have suffered "sudden death in the hospital ... or in [defendant's] office, rather than at home." However, on cross-examination, Dr. Factor admitted it was possible additional samples of decedent's heart could have shown more widespread inflammation and necrosis.

At the close of evidence, defendant moved for a directed verdict, arguing plaintiff's evidence on "the issue of proximate cause was not supported by ... experts that were appropriately qualified to give that testimony." The trial judge disagreed and denied the motion. Plaintiff also moved for a directed verdict, arguing defendant failed to present proofs showing "apportionment with respect to the ultimate injury[.]" She requested "the jury be instructed that the defendant has failed to prove that some portion of the plaintiff's ultimate injury would have occurred even if the defendant's treatment was proper." After considering the parties' arguments on this issue, the judge reserved her decision.

The charge explained the jury's obligation to make credibility determinations for all witnesses, including those qualified as experts. The judge instructed the jurors they were "not bound by the testimony of an expert"; rather, they were entitled to "give it whatever weight [they] deem[ed] ... appropriate[,]" and accept or reject "all or part of an expert's opinion[ ]." The jury was told that when "examining each expert's opinion, you may consider the person's reasons for testifying ... and the believability of the

expert, including all the considerations that generally apply when you are deciding whether or not to believe a witness' testimony."

Addressing the specific facts of the case, the court informed the jury it must determine the applicable standard of care and then consider whether defendant complied with or breached that standard. The judge advised: "[I]f you find that defendant has deviated from the standard of care resulting in injury or damage to plaintiff, then you should find defendant negligent and return a verdict for plaintiff." The instructions detailed the respective burdens of proof and explained the parties' theories regarding defendant's conduct:

[T]he plaintiff must first prove that the defendant's negligence increased the risk of harm posed by plaintiff's preexisting condition.

Second, the plaintiff must prove that the increased risk was a substantial factor in producing the ultimate harm, which was his death. If the negligence was only remotely or insignificantly related to [decedent]'s death, then the negligence does not constitute a substantial factor.

However, the defendant's negligence ... need not be the only cause, or even a primary cause, of his death for the negligence to be a substantial factor in producing the ultimate harm. Whether the increased risk was a substantial factor is to be reflected in the apportionment of damages between the increased risk and the pre-existing condition....

[P]laintiff does not have to prove offering the office appointment or having the conversation on the phone with [decedent] would have resulted in avoiding the harm.

. . . .

If you find that the plaintiff has proven that the defendant was negligent, the plaintiff is not required to quantify or put a percentage on the extent to which the defendant's negligence added to all of plaintiff's final injuries. In cases where the defendant's negligence accelerated or worsened the plaintiff's pre-existing condition, the defendant is responsible for all of plaintiff's injuries, unless the defendant is able to reasonably apportion the damages.

If the defendant claims that all or part of plaintiff's injuries would have occurred anyway, then the defendant and not the plaintiff has the burden of proving what percentage of plaintiff's injuries would have occurred, even if the defendant had not been negligent. If the injuries can be so apportioned, then the defendant is responsible only for the amount of ultimate harm caused by the negligence.

. . . .

On the other hand, if you find that the defendant has not met the burden ... of proving that plaintiff's injuries can be reasonably apportioned, then the defendant is responsible for all of plaintiff's harm or injury.

The jury was given a verdict sheet that included five questions:

1) Did the [p]laintiff, Ozlem Koseoglu, prove that the [d]efendant, Dr. Wry deviated from accepted standards of medical practice?

. . . .

2) Did [p]laintiff, Ozlem Koseoglu, prove that Dr. Wry's, deviation increased the risk of harm posed by Mr. Koseoglu's preexisting condition?

. . . .

3) Did the defendant prove that some portion of the plaintiff's ultimate injury would have occurred, even if the defendant's treatment was proper?

. . . .

4) State whether the increased risk [was] a substantial factor in causing the plaintiff's damages by stating, in percentages, what portion of the ultimate injury is a result from:

A.  The pre-existing condition

B.  Dr. Wry's deviation from the standard of care

. . . .

5) What amount of money would fairly and reasonably compensate each [p]laintiff[?]

The jury returned a verdict in favor of plaintiff, responding affirmatively to questions one, two and three.  In allocating liability, the jury determined eighty percent of the ultimate injury was related to the pre-existing condition, while twenty percent was a result of defendant's deviation.  The jury valued plaintiff's total loss at $1,000,000, as divided between plaintiff and her children.

Plaintiff moved for JNOV, arguing the jury's rejection of defendant's defense of no-increased-risk rendered defendant unable to satisfy her burden regarding apportionment.  Accordingly, plaintiff sought to set aside the jury's allocation of liability in favor of awarding her the entire amount of damages.  Defendant filed a cross-motion for JNOV, arguing plaintiff's evidence· was insufficient to establish defendant's conduct increased the risk of ultimate harm.

Judge Harz denied the motions and on September 23, 2011, entered an amended order for judgment in favor of plaintiff in the

amount of $220,254.79, inclusive of pre-judgment interest. These cross-appeals ensued.

## II.

Our review of a trial judge's determination on a motion for JNOV, pursuant to *Rule* 4:40–2, is "'quite a mechanical one.'" *Sons of Thunder v. Borden, Inc.*, 148 *N.J.* 396, 415, 690 *A.*2d 575 (1997) (quoting *Dolson v. Anastasia*, 55 *N.J.* 2, 5, 258 *A.*2d 706 (1969)).

[T]he test is ... whether "the evidence, together with the legitimate inferences therefrom, could sustain a judgment in ... favor" of the party opposing the motion, i.e., if, accepting as true all the evidence which supports the position of the party defending against the motion and according him the benefit of all inferences which can reasonably and legitimately be deduced therefrom, reasonable minds could differ, the motion must be denied.

[*Ibid.* (quoting *Dolson, supra*, 55 *N.J.* at 5, 258 *A.*2d 706) (alterations in original).]

We, like the trial court, are not concerned with "the worth, nature or extent (beyond a scintilla) of the evidence, but only with its existence, viewed most favorably to the party opposing the motion." *Ibid.* We will not disturb the trial judge's determination if "the evidence, together with the legitimate inferences therefrom, could sustain a judgment in the [non-movant]'s favor." *Ibid.* *Accord Riley v. Keenan*, 406 *N.J.Super.* 281, 298, 967 *A.*2d 868 (App.Div.) (citing *Lanzet v. Greenberg*, 126 *N.J.* 168, 174, 594 *A.*2d 1309 (1991)), *certif. denied*, 200 *N.J.* 207, 976 *A.*2d 384 (2009).

## III.

The issues presented by the parties challenge the denial of their respective motions for JNOV. Plaintiff seeks to set aside the apportioned verdict. She argues the evidence established defendant's negligent treatment increased the risk of decedent's death from myocarditis, but the defense failed to prove a basis supporting allocation. Accordingly, she asserts, the jury's finding that eighty percent of the "ultimate injury" resulted from the pre-existing condition was mere speculation. Defendant maintains plaintiff's medical witnesses lacked expertise to address causation,

and plaintiff otherwise presented no competent, credible proof supporting causation. Understanding these issues are intertwined, we will consider defendant's claims prior to addressing plaintiff's. We first recite the requirements to sustain a plaintiff's verdict in a medical negligence action involving a pre-existing condition.

A.

"A medical malpractice case is a kind of tort action in which the traditional negligence elements are refined to reflect the professional setting of a physician-patient relationship." *Verdicchio v. Ricca*, 179 *N.J.* 1, 23, 843 *A.*2d 1042 (2004). Generally, "[t]o establish a prima facie case of negligence in a medical-malpractice action, a plaintiff must present expert testimony establishing (1) the applicable standard of care; (2) a deviation from that standard of care; and (3) that the deviation proximately caused the injury[.]" *Gardner v. Pawliw*, 150 *N.J.* 359, 375, 696 *A.*2d 599 (1997) (internal citations omitted). Most cases, including this one, turn on proof of causation.

When concurrent forces combine to cause a plaintiff's injury, the traditional "but for" causation test (asking whether the injury would not have occurred but for the defendant's negligence), is inappropriate. Rather, a more flexible standard is used for proving causation. *Verdicchio, supra*, 179 *N.J.* at 24, 843 *A.*2d 1042. "New Jersey, like many jurisdictions, has adopted . . . the substantial factor standard—'limited to that class of cases in which a defendant's negligence combines with a pre-existent condition to cause harm—as distinguished from cases in which the deviation alone is the cause of harm.'" *Ibid.* (quoting *Battenfeld v. Gregory*, 247 *N.J.Super.* 538, 549, 589 *A.*2d 1059 (App.Div.1991)). "A plaintiff suffering from a pre-existent condition must prove that, as a result of a defendant's negligence, she experienced an increased risk of harm from that condition, and that the increased risk of harm was a substantial factor in causing the injury ultimately sustained." *Gardner, supra*, 150 *N.J.* at 375, 696 *A.*2d

599 (citing *Anderson v. Picciotti,* 144 *N.J.* 195, 210, 676 *A.*2d 127 (1996)).

> Once the plaintiff demonstrates that the defendant's negligence actually increased the risk of an injury that later occurs, that conduct is deemed to be a cause "in fact" of the injury and the jury must then determine the proximate cause question: whether the increased risk was a substantial factor in bringing about the harm that occurred.
>
> [*Verdicchio, supra,* 179 *N.J.* at 24, 843 *A.*2d 1042.]

Thus, "[t]he 'substantial factor' standard requires the jury to determine whether the deviation, in the context of the pre-existent condition, was sufficiently significant in relation to the eventual harm to satisfy the requirement of proximate cause." *Scafidi v. Seiler,* 119 *N.J.* 93, 108–09, 574 *A.*2d 398 (1990) (citations omitted). *See also Gardner, supra,* 150 *N.J.* at 387, 696 *A.*2d 599 (holding when a plaintiff alleges failure to perform a diagnostic test, the plaintiff must demonstrate that the omission increased the risk of harm from the pre-existing condition).

The jury must decide whether a defendant's negligence was a substantial factor in causing a plaintiff's ultimate injury. *Verdicchio, supra,* 179 *N.J.* at 24–25, 843 *A.*2d 1042; *Velazquez v. Jiminez,* 336 *N.J.Super.* 10, 31, 763 *A.*2d 753 (App.Div.2000), *aff'd,* 172 *N.J.* 240, 798 *A.*2d 51 (2002). "Conduct is a substantial factor if it would lead the trier of fact, as a reasonable person, to regard it as a cause, using that word in the popular sense." *Verdicchio, supra,* 179 *N.J.* at 24–25, 843 *A.*2d 1042 (internal quotation marks and citation omitted). Rarely can a plaintiff absolutely demonstrate what result would have occurred had the defendant not been negligent. Consequently, " 'a defendant's deviation need not be the only cause, nor a primary cause, for the deviation to be a substantial factor' "; however, a plaintiff must show a defendant played " 'a role that is both relevant and significant in bringing about the ultimate injury[,]' " and not merely that defendant acted in a way that is " 'remote or . . . inconsequential[.]' " *Id.* at 30, 843 *A.*2d 1042 (quoting *Reynolds v. Gonzalez,* 172 *N.J.* 266, 288, 798 *A.*2d 67 (2002)). *Accord Model Jury Charge (Civil),* 5.50E, "Pre–Existing Condition—Increased Risk/Loss of Chance—Proximate Cause" (2010).

Once the plaintiff establishes the defendant's negligence was a substantial contributing cause of the injury, the plaintiff is entitled to recover damages. *Verdicchio, supra,* 179 *N.J.* at 25, 843 *A.*2d 1042. However, a "defendant should only be held responsible for the portion of the harm attributed to his or her conduct[.]" *McLean v. Liberty Health Sys.,* 430 *N.J.Super.* 156, 170, 62 *A.*3d 922 (App.Div.2013). The defendant bears the burden of demonstrating apportionment of damages between his conduct and any pre-existing condition. *Verdicchio, supra,* 179 *N.J.* at 37, 843 *A.*2d 1042; *Fosgate v. Corona,* 66 *N.J.* 268, 272–73, 330 *A.*2d 355 (1974). If a defendant fails to present proof supporting apportionment, the jury is "entitled ... to hold him 100% liable for the [plaintiff]'s losses." *Verdicchio, supra,* 179 *N.J.* at 38, 843 *A.*2d 1042. *Accord Model Jury Charge (Civil),* 5.50E at n. 6, "Pre–Existing Condition—Increased Risk/Loss of Chance—Proximate Cause" (2010) ("If there is no evidence submitted as to apportionment of damage, then the defendant is responsible for the full injury and all damages.").

Regarding the nature and quantum of evidence, it need not be ample or precise. *See, e.g., Boryszewski v. Burke,* 380 *N.J.Super.* 361, 384, 882 *A.*2d 410 (App.Div.2005) ("Regardless of which party bears the burden of proof, the quantum of evidence required to qualify for an apportionment charge is low."), *certif. denied,* 186 *N.J.* 242, 892 *A.*2d 1288 (2006). In this regard, defendant need not produce proofs "amounting to scientific or mathematical precision as to how much [causal factor] contributed in percentage points to [the] ultimate death." *Poliseno v. Gen. Motors Corp.,* 328 *N.J.Super.* 41, 60, 744 *A.*2d 679 (App.Div.), *certif. denied,* 165 *N.J.* 138, 754 *A.*2d 1213 (2000).

### B.

Defendant urges reversal claiming the judge erroneously denied her motion. She suggests plaintiff's experts lacked "the expertise to testify regarding the diagnosis and treatment of myocarditis[,]" and no evidence showed defendant's conduct increased the risk of

harm posed by decedent's pre-existing focal myocarditis. We disagree.

"[T]he competency of a witness to testify as an expert is remitted to the sound discretion of the trial court. Absent a clear abuse of discretion, an appellate court will not interfere with the exercise of that discretion." *Carey v. Lovett,* 132 *N.J.* 44, 64, 622 *A.*2d 1279 (1993) (citing *Henningsen v. Bloomfield Motors, Inc.,* 32 *N.J.* 358, 411, 161 *A.*2d 69 (1960)). *Accord Hisenaj v. Kuehner,* 194 *N.J.* 6, 16, 942 *A.*2d 769 (2008). "The test of an expert witness's competency in a malpractice action is whether he or she has sufficient knowledge of professional standards to justify the expression of an opinion." *Carey, supra,* 132 *N.J.* at 64, 622 *A.*2d 1279. Therefore, if the witness can be qualified as an expert based on "knowledge, skill, experience, training, or education[,]" *N.J.R.E.* 702, the trial court should allow admission of the testimony for the jury's consideration. *Espinal v. Arias,* 391 *N.J.Super.* 49, 58–59, 916 *A.*2d 1081 (App.Div.), *certif. denied,* 192 *N.J.* 482, 932 *A.*2d 32 (2007).

A review of the voir dire of plaintiff's experts reveals they each held sufficient knowledge and qualifications to proffer the offered expert testimony. *See Rosenberg v. Tavorath,* 352 *N.J.Super.* 385, 400, 800 *A.*2d 216 (App.Div.2002) (explaining " '[a] witness may be qualified to testify as an expert either by study without practice or by practice without study' " (quoting *State v. Chatman,* 156 *N.J.Super.* 35, 41, 383 *A.*2d 440 (App.Div.), *certif. denied,* 79 *N.J.* 467, 401 *A.*2d 224 (1978))).

Admittedly, plaintiff's experts were not specialists in the diagnosis or treatment of myocarditis; however, this was not a failure-to-diagnose case. Dr. Grossbard, an internist like defendant, had encountered myocarditis infrequently, but had diagnosed patients with the disease, and was extensively familiar with medical literature on its diagnosis and treatment. Similarly, Dr. Melnick, a certified emergency medicine physician who was also certified in advanced cardiac and trauma life support, had treated emergency room patients with myocarditis and had formal train-

ing and education regarding the disease. The experts' training, past experiences, and limited past treatment of patients with myocarditis were subjects thoroughly explored during cross-examination.

Next, defendant argues plaintiff's experts' opinions regarding causation were speculative and should not have reached the jury. Plaintiff's theory of liability contended defendant was negligent in not offering an appointment to examine decedent. Had defendant done so, plaintiff asserted, she would have been alerted to decedent's heart-related problems and referred him for hospitalization, where steps could have been taken to diagnose and treat the condition. Both Drs. Grossbard and Melnick addressed how defendant's omission precluded diagnostic testing that likely would have revealed decedent's heart arrhythmia. Defendant was decedent's regular family physician, so she presumably knew he was a young, otherwise healthy man. All the experts agreed decedent's myocarditis resulted from the viral syndrome. As plaintiff described when she called defendant's office, decedent's symptoms, especially his high fever and lack of energy, were significantly persistent and severe. Further, Dr. Grossbard discussed the statistical success of treatment if administered. Whether an examination would have triggered a cardiac diagnosis will never be known because of defendant's conduct.

Defendant also suggests her experts were authorities in myocarditis, emphasizing Drs. Julie, Granet, and Factor all agreed the myocarditis was localized to one area of decedent's heart such that cardiac abnormalities would not have been present even had defendant examined him. Defendant's challenge is directed to the credibility and weight to be given the experts' testimonial evidence, two subjects squarely left for the jury's determination.

The jury alone determines whether and how much of an expert's testimony to accept. "An expert's skill or knowledge go to the weight to be accorded the expert testimony." *Espinal,* *supra,* 391 *N.J.Super.* at 59, 916 *A.*2d 1081 (internal quotation marks and citations omitted). The weight to which an expert

opinion is entitled to receive rests with "the unique role of the jury[,]" which is charged with assessing the credibility of all witnesses and determining the weight to be given to their testimony. *City of Long Branch v. Jui Yung Liu,* 203 *N.J.* 464, 491, 4 *A.*3d 542 (2010). *See also Espinal, supra,* 391 *N.J.Super.* at 59, 916 *A.*2d 1081 ("Deficiencies in the qualification of an expert is a matter to be weighed by the jury.").

Drs. Grossbard's and Melnick's substantive testimony relied upon foundational facts from plaintiff's testimony and decedent's autopsy. Each opined on defendant's conduct and what would likely have transpired had decedent been examined by defendant when plaintiff called for an appointment. They sufficiently explained the bases for their conclusions that defendant's negligence deprived decedent of a chance to survive myocarditis. Viewed in a light most favorable to plaintiff, the properly admitted expert testimony provided sufficient evidence for the jury to find there was an increased risk of the ultimate injury resulting from defendant's negligence, which was a substantial factor in contributing to decedent's death.

## C.

Citing *Verdicchio, supra,* plaintiff challenges the proof supporting the allocation of damages. She asserts the judge erred in denying her motion for JNOV seeking to disregard the jury's verdict on the third jury question. We disagree.

We note the jury instructions and interrogatories are taken from our Model Civil Jury Charges. *See Model Jury Charge (Civil),* 5.50E, "Pre–Existing Condition—Increased Risk/Loss of Chance—Proximate Cause" (2010). The jury charge clearly described plaintiff's burden of proof and the jury found defendant deviated from the accepted standard of care, which increased the risk of harm posed by decedent's pre-existing myocarditis. The first two jury questions on the verdict sheet were directed to these issues. Question three then asked the jury to determine whether defendant showed some portion of the ultimate harm would have

occurred anyway. Notwithstanding this shift away from plaintiff's proofs, plaintiff retained the burden to show defendant's negligent deviation, which increased the risk of harm, was a substantial factor in causing plaintiff's harm. *Verdicchio, supra,* 179 *N.J.* at 24, 843 *A.*2d 1042.[3]

We also reject plaintiff's argument challenging, as unsupported, the jury's finding defendant successfully proved some portion of the ultimate injury would have resulted despite defendant's negligence. Notwithstanding the principal defense advocating defendant's conduct was not a substantial factor contributing to decedent's death, sufficient evidence was presented to allow the jury to determine whether and to what extent defendant's negligence contributed to the ultimate harm. Further, we concur with Judge Harz's distinction between the problematic expert testimony in *Verdicchio* and the testimony in this matter by Drs. Julie, Granet, and Factor.

The defense experts relied on plaintiff's report that decedent was not experiencing chest pains, along with the autopsy findings, to support their conclusion decedent's myocarditis was so localized that cardiac abnormalities would not have been evident even had defendant examined him. Dr. Factor detailed his actual review of the autopsy tissue samples and discussed his findings of a very small necrotic area in the right ventricle, which would not have caused an abnormal EKG. Unlike the "wholly conclusory" inade-

---

[3] As an observation, the Model Charge recites each element of plaintiff's burden of proof, including a plaintiff's burden to prove defendant deviated from the accepted standard of care, which increased the risk of harm posed by decedent's pre-existing condition, and defendant's negligent act constitutes a substantial factor in causing the harm. However, we cannot explain why the jury interrogatories separate these elements of a plaintiff's case. As noted questions one and two reflect the first two elements a plaintiff must prove, then question three shifts to defendant's proofs. More important, question four conflates defendant's obligation with respect to apportionment of damages with plaintiff's burden to prove defendant's negligence was a substantial factor in the resultant harm. Although not an issue in this case, the jury interrogatories as drafted, and consequently as used by trial courts, seem problematic and likely to misdirect the jury.

quate expert testimony in *Verdicchio, supra,* 179 *N.J.* at 37–38, 843 *A.*2d 1042, the defense experts presented opinions supported by detailed facts, which allowed the jury to weigh the loss attributable to defendant's negligence.

Despite plaintiff's urging that defendant was solely liable for decedent's death, it was undisputed decedent suffered from myocarditis when he sought treatment from defendant. Even plaintiff's experts agreed myocarditis can be asymptomatic, making it difficult to diagnose, which is why it often results in death. Also, decedent's symptoms did not include typical heart-related signs, such as chest pains and shortness of breath. These facts support apportionment.

Defendant's trial strategy—suggesting the ultimate outcome would have been unchanged had she given decedent an appointment and conducted an examination—does not alter the hotly contested question of whether an office visit would have revealed decedent had more than the flu. The experts disagreed on whether decedent's symptoms would trigger further consideration of a heart condition. Such a determination was not clear-cut, but was at the heart of the jury's determinations.

Not surprisingly, the jury took "a more moderate position than propounded by either of the parties," and chose to "accept or reject so much of each side's evidence as it found credible or not credible." *Boryszewski, supra,* 380 *N.J.Super.* at 384–85, 882 *A.*2d 410. The jury's partial rejection of defendant's evidence does not mean defendant failed to meet her burden of proof on the issue of apportionment. Rather, it reflects the jury's diligent response to the court's proper instructions to discern whether the ultimate outcome would have occurred had defendant not been negligent. The jury exercised its responsibility to consider all evidence, fix credibility, accept or reject the testimony presented, and decide all material issues of fact.

As noted by Judge Harz, the record reflects defendant presented sufficient evidence to allow the jury to rationally and fairly

quantify the percentage of damages proximately caused by defendant's negligence. *See Dafler v. Raymark Indus., Inc.,* 259 *N.J.Super.* 17, 36, 611 *A.*2d 136 (App.Div.1992), *aff'd o.b.* 132 *N.J.* 96, 622 *A.*2d 1305 (1993). Accordingly, we conclude there is no basis to disturb the jury's verdict. The orders denying the motions for JNOV were properly denied, and the final judgment remains unchanged.

Affirmed.