**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1194-19

ELVIRA DUBOIS, as the
administratrix of the estate
of MARGARET SEBASTIAN,

    Plaintiff-Appellant/
    Cross-Respondent,

v.

SENIOR LIVING SOLUTIONS,
LLC d/b/a BRIDGEWAY CARE
AND REHABILIATION AT
HILLSBOROUGH,[1]

    Defendant-Respondent/
    Cross-Appellant,

and

ROBERT WOOD JOHNSON
UNIVERSITY HOSPITAL NEW
BRUNSWICK, ROBERT WOOD
JOHNSON UNIVERSITY
HOSPITAL SOMERSET,
SHEHZANA ASHRAF, M.D., and
JULIET LWANGA, M.D.,

---

[1] Incorrectly pleaded as "Bridgeway Senior Healthcare d/b/a Bridgeway Care and Rehabilitation Center at Hillsborough" and "Bridgeway."

Defendants-Respondents.

_____

Submitted March 1, 2021 – Decided August 5, 2021

Before Judges Messano, Hoffman, and Suter.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Docket No. L-5987-16.

Lance Brown and Associates, LLC, attorneys for appellant/cross-respondent (Lance D. Brown, Sherry L. Foley, and Timothy J. Foley, of counsel and on the briefs; Sommer L. Spillane and David Schwadron, on the briefs).

Marks, O'Neill, O'Brien, Doherty & Kelly, PC, attorneys for respondent/cross-appellant (Frances Wang Deveney and Shannon B. Adamson, on the briefs).

Rosenberg Jacobs Heller & Fleming, PC, attorneys for respondents Robert Wood Johnson University Hospital New Brunswick and Robert Wood Johnson University Hospital Somerset (Raymond J. Fleming, of counsel; Christopher Klabonski, on the brief).

Farkas & Donohue, LLC, attorneys for respondents Shehzana Ashraf, M.D., and Juliet Lwanga, M.D. (Evelyn C. Farkas, of counsel; Christine M. Jones, on the brief).

PER CURIAM

2

A-1194-19

Plaintiff Elvira Dubois, administratrix of the estate of Margaret Sebastian, filed this medical malpractice action against defendants Robert Wood Johnson University Hospital New Brunswick and Somerset (RWJ), Doctors Shehzana Ashraf and Juliet Lwanga, and Senior Living Solutions, LLC d/b/a/ Bridgeway Care and Rehabilitation Center at Hillsborough (SLS). The allegations in the complaint involved the medical and nursing care defendants provided to eighty-six-year old Sebastian following a fall in her home on November 1, 2014.

After a protracted discovery period, SLS moved for summary judgment, and RWJ cross-moved for partial summary judgment. The essence of the arguments was that plaintiff's expert, Dr. Perry Starer, board certified in internal medicine and geriatrics, was unqualified to opine as to the appropriate standard of nursing care. After considering oral argument, the judge granted SLS's motion in part, dismissing plaintiff's claim of vicarious liability for Dr. Lwanga's alleged negligence because she was not an employee of SLS, and plaintiff's claim for punitive damages. The judge otherwise denied the motions without prejudice, concluding that a N.J.R.E. 104 hearing on Dr. Starer's qualifications was necessary at or before the time of trial, which was set for September 30, 2019. The judge's July 19, 2019 orders (the July orders) preserved SLS's and

3

RWJ's right to file a formal motion to bar Dr. Starer as an expert on the subject of nursing care.

Defendants subsequently filed a flurry of motions and cross-motions. Drs. Ashraf and Lwanga challenged the adequacy of the opinions rendered by Dr. Starer and sought to bar him from testifying on issues of causation. They also argued that lacking adequate expert evidence on the issue of causation from Dr. Starer and Dr. Charles E. Metzger, plaintiff's other expert who was board certified in internal medicine, summary judgment was appropriate. SLS's cross-motion sought summary judgment on similar grounds. RWJ's cross-motion sought to bar the testimony of Dr. Starer "concerning nursing care." RWJ subsequently filed a cross-motion for summary judgment. The notice of motion sought dismissal of all claims for medical malpractice "apart from those for failure to properly treat and prevent pressure ulcers." SLS subsequently moved to bar Dr. Starer's testimony regarding nursing malpractice.

The motions were to be heard on August 30, 2019. However, on the afternoon of August 29, plaintiff apparently emailed to defendants an expert report dated the same day by board-certified vascular surgeon Dr. Antonios P.

Gasparis, who was never previously identified by plaintiff in discovery.[2] Defendants immediately objected.

After hearing oral argument, the judge entered an order on September 16, 2019 (the September order), supported by a lengthy written opinion. The order granted the motion to bar Dr. Starer's testimony and granted all defendants summary judgment dismissing plaintiff's complaint with prejudice.

Plaintiff moved for reconsideration. Counsel certified to the following:

> After [d]efendants' summary judgment motions were filed, I retained a different vascular surgeon who advised me on August 23, 2019 that he would not serve as our expert. This left me with an incredibly short period of time to attempt to find a competent expert who could review voluminous records and potentially write a report, which we were able to do by August 29, 2019.

Plaintiff also urged the judge to reconsider the dismissal of its "pressure ulcer" claim against RWJ, arguing Dr. Starer was competent to provide expert opinions on the subject and that his report and testimony was sufficient to establish a prima facie case of medical malpractice on this discrete issue. The judge denied the motion for reconsideration by order dated October 25, 2019 (the October order), spreading his reasons orally on the record.

---

[2] The appellate record includes the report and the responses from defense counsel, but not any transmittal correspondence from plaintiff's counsel.

A-1194-19

Plaintiff appeals from the September and October orders. She contends the judge violated her due process rights by "sua sponte" dismissing the "pressure injury claim" without ever conducting the N.J.R.E. 104 hearing, and even though RWJ never sought this relief. Plaintiff also contends the judge erred by applying the "but for" standard of proximate cause instead of the "increased risk doctrine"; according to plaintiff, the expert reports of Drs. Metzger and Starer established a prima facie case of malpractice if the proper standard were applied. Finally, plaintiff argues that it was error to grant summary judgment to SLS and Drs. Ashraf and Lwanga without considering Dr. Gasparis' late report, and, even without that report, plaintiff contends she established a genuine issue of material fact as to whether those defendants "contributed" to Sebastian's death.

Defendants oppose these arguments. Additionally, SLS filed a cross-appeal from the July order. It contends the judge erred in ordering an N.J.R.E. 104 hearing on whether Dr. Starer was qualified to opine on the appropriate standard of nursing care because he was not, and, therefore, the judge should have granted SLS's original summary judgment motion.

6

Having considered these arguments in light of the motion record and applicable legal standards, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

I.

We limit our review to the record before the motion judge. See Ji v. Palmer, 333 N.J. Super. 451, 463–64 (App. Div. 2000) (holding appellate review of the grant of summary judgment is limited to the record that existed before the motion judge (citing Bilotti v. Accurate Forming Corp., 39 N.J. 184, 188 (1963))).

On the day following her fall, Sebastian presented at RWJ Somerset with atrial fibrillation, two fractured ribs, and a non-ST elevation myocardial infarction. Dr. Ashraf was her attending physician. Three days later, she underwent cardiac catheterization, and, on November 7, Sebastian was discharged to SLS. A nurse there noticed purple discoloration on Sebastian's groin area near the site of the catheterization. By November 9, the staff noticed the area had become a "large, hard, shiny hematoma" that extended "down [one-third] of [Sebastian's] thigh." The area was "painful to minimal touch." SLS staff call 9-1-1, and Sebastian was transported back to RWJ Somerset.

A-1194-19

Records demonstrated that plaintiff had suffered significant blood loss and ultrasound examination of her groin area was read as presenting a "pseudoaneurysm."[3]   Sebastian underwent surgical repair at RWJ New Brunswick on November 9, and her wound became infected and required debridement a few days later.  Additionally, by November 14, she had developed a Stage Two sacral pressure ulcer, which worsened during Sebastian's stay at RWJ New Brunswick.  Sebastian was transferred to the ICU after suffering respiratory distress; she died on December 1, 2014.

Dr. Starer prepared two reports.  As to Dr. Ashraf and RWJ, he opined that they failed to properly address Sebastian's risk for bleeding following the catheterization procedure, resulting in her loss of blood and developing anemia. This resulted in her hospitalization, during which Sebastian "developed a pressure ulcer, became infected, and died."  According to Dr. Starer, these

---

[3]  The parties disputed whether plaintiff had a pseudoaneurysm or a hematoma. A pseudoaneurysm is defined as "[a] cavity due to ruptured myocardial infarction that has been contained by an intact parietal pericardium and communicates with the left ventricle by a narrow neck."  Stedman's Medical Dictionary 1450 (26th ed. 1995).  A hematoma is "[a] localized mass of extravasated blood that is relatively or completely confined within an organ or tissue, a space, or a potential space; the blood is usually clotted (or partially clotted), and, depending on how long it has been there, may manifest various degrees of organization and decolorization."  Id. at 772.

A-1194-19

defendants "failed to develop and implement a comprehensive care plan to prevent skin wounds from occurring and . . . deteriorating."

As to Dr. Lwanga and the SLS staff, Dr. Starer opined they failed to diagnose Sebastian's loss of blood and failed "to properly develop and implement a care plan to address [her] risk for bleeding." This led to conditions that "contributed to [Sebastian's] death."

Dr. Metzger's report criticized Dr. Ashraf's failure to examine Sebastian's groin area to "rule out a pseudoaneurysm," "a known potential complication of cardiac catheterization." Had the condition been detected earlier, Dr. Metzger concluded it would have "required only conservative treatment rather than surgery . . . and [Sebastian] would have survived." Dr. Metzger reached the same conclusions about Dr. Lwanga.

Defendants' motions were supported with portions of Dr. Metzger's and Dr. Starer's deposition testimony. Dr. Metzger acknowledged being uncertain as to what factors determine whether a patient requires surgery for a pseudoaneurysm versus conservative treatment; he would defer to a vascular surgeon or interventional radiologist on the issue. He would also defer to a vascular surgeon regarding what conservative treatment options might exist and

A-1194-19

the factors to consider in deciding whether conservative treatment was warranted.

Dr. Starer offered no opinions about the treatment options available for Sebastian's hematoma or pseudoaneurysm, but he believed it was more likely that a hematoma did not develop until the early morning of November 9, the day Sebastian left SLS's care. However, he could not be sure because the SLS staff failed to properly monitor the situation.

Dr. Gasparis is board-certified in general and vascular surgery. In his report, Dr. Gasparis opined that the early bruising on Sebastian's groin should have been investigated further. A physical examination and consideration of "a significant drop in her blood count from admission and from post-catheterization levels" should have "warrant[ed] investigation for [a pseudoaneurysm] with an ultrasound" prior to Sebastian's discharge to SLS. According to Dr. Gasparis, the condition could have been treated then with "a non-surgical option," such as "compression or thrombin injection." Avoiding surgery would have avoided the complications that subsequently occurred and led to Sebastian's death.

## II.

We first address the issues raised by plaintiff's service of Dr. Gasparis' report the afternoon before the summary judgment motions were to be heard.

10

During oral argument on defendants' motions, the judge asked counsel, "[H]ow is it that I should even consider that [report]?" Plaintiff's counsel contended the late report was simply rebuttal of issues regarding causation raised by defendants' motions, and Dr. Gasparis' report was consistent with Dr. Metzger's opinions. Counsel alternatively orally sought to reopen discovery.

During oral argument, the judge expressed a firm belief that pursuant to Rule 4:17-7, he should disregard Dr. Gasparis' report. In a footnote in his written opinion, the judge explained that he did disregard the report in considering the motions.

Before us, plaintiff reiterates the contention that the late-served report was proper rebuttal of an argument "presented for the first time in the opposing party's case." We disagree and conclude the report was properly disregarded by the judge in his consideration of the pending summary judgment motions.

"An appellate court applies 'an abuse of discretion standard to decisions made by [the] trial courts relating to matters of discovery.'" C.A. by Applegrad v. Bentolila, 219 N.J. 449, 459 (2014) (alteration in original) (quoting Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 371 (2011)). "It 'generally defer[s] to a trial court's disposition of discovery matters unless the court has abused its discretion[,] or its determination is based on a mistaken

11

understanding of the applicable law.'" Ibid. (first alteration in original) (quoting

Pomerantz Paper Corp., 207 N.J. at 371).

Rule 4:17-7 prohibits a party from amending interrogatory answers within

twenty days of the discovery end date unless the party

> certifies . . . that the information requiring the
> amendment was not reasonably available or
> discoverable by the exercise of due diligence prior to
> the discovery end date. . . . Amendments may be
> allowed thereafter only if the party seeking to amend
> certifies therein that the information requiring the
> amendment was not reasonably available or
> discoverable by the exercise of due diligence prior to
> the discovery end date. In the absence of said
> certification, the late amendment shall be disregarded
> by the court and adverse parties.

Obviously, plaintiff's late service of an expert vascular surgeon's report violated

every provision of the rule. Nothing further needs to be said. R. 2:11-3(e)(1)(E).

Furthermore, arguing the report was proper rebuttal of the defendants'

motions does not compel a different conclusion. "Generally, summary judgment

is inappropriate prior to the completion of discovery[,]" Wellington v. Estate of

Wellington, 359 N.J. Super. 484, 496 (App. Div. 2003) (citing Velantzas v.

Colgate-Palmolive Co., 109 N.J. 189, 193 (1988)), and, absent good cause, the

motion should be made returnable no later than thirty days before trial. R. 4:46-

1. This procedural framework limits the parties' ability to continue to seek

further discovery or serve additional discovery in response to arguments raised by opponents shortly before trial.

The thrust of defendants' arguments was that plaintiffs' experts failed to establish that any alleged deviation from post-catheterization standards of care was a proximate cause of plaintiff's surgery, hospitalization and ultimate death. Plaintiff clearly should have anticipated that proximate cause was a critical element in establishing a prima facie case of medical negligence. Komlodi v. Picciano, 217 N.J. 387, 409 (2014). Furthermore, generally, expert opinion is necessary to establish causation. Gardner v. Pawliw, 150 N.J. 359, 375 (1997) (citing Germann v. Matriss, 55 N.J. 193, 205 (1970)). Curing this deficiency in her case was the true, indeed the only reason why plaintiff belatedly sought to have Dr. Gasparis' report and potential testimony admitted. Counsel admitted as much in his certification filed in support of the motion for reconsideration.[4] The judge properly refused to consider Dr. Gasparis' report.

### III.

Plaintiff contends that even without Dr. Gasparis' report and testimony, she established a prima facie case of medical negligence through the reports and

---

[4] SLS argues that even if Dr. Gasparis' report was admitted, he never rendered an opinion about SLS' negligence. We agree.

A-1194-19

testimony of Drs. Starer and Metzger pursuant to the "increased risk doctrine," and the judge erred by dismissing her complaint because he mistakenly utilized the "but for" causation standard. We disagree.

In a medical malpractice action, "[a]s a general rule, it is the causation element that is the most complex." Verdicchio v. Ricca, 179 N.J. 1, 23 (2004). Because the traditional "but for" causation standard "has its limitations in situations where two or more forces operate to bring about a certain result," our courts have adopted the "substantial factor" causation standard in such situations. Id. at 24.

> The substantial factor test allows the plaintiff to submit to the jury not whether "but for" defendant's negligence the injury would not have occurred but "whether the defendant's deviation from standard medical practice increased a patient's risk of harm or diminished a patient's chance of survival and whether such increased risk was a substantial factor in producing the ultimate harm."
>
> [Ibid. (quoting Gardner, 150 N.J. at 376).]

Here, during oral argument, the judge asked counsel if the causation issue implicated the Court's decision in Scafidi v. Seiler, 119 N.J. 93 (1990);[5] all

---

[5] In Scafidi, the Court held, "Evidence demonstrating within a reasonable degree of medical probability that negligent treatment increased the risk of harm posed by a preexistent condition raises a jury question whether the increased risk was

answered affirmatively. It is clear the judge understood the proper causation standard to be applied.

The judge concluded, however, that both Drs. Starer and Metzger were unable to render anything other than net opinions about how alleged deviations from the standard of care — defendants' failure to check plaintiff's groin area and treat the hematoma or pseudoaneurysm sooner — were substantial factors in the ultimate harm, i.e., plaintiff's death. As to Dr. Metzger, the judge noted that he rendered his opinion "in the admitted absence of qualifications to testify in the disciplines of vascular surgery and interventional radiology, which, he readily concede[d], are specialties that could opine on what 'conservative treatment' modalities could have been, but were not rendered[.]"

The judge reached a similar conclusion with respect to Dr. Starer.

> Dr. Starer does not offer an opinion in this matter that the decedent sustained a pseudoaneurysm. Dr. Starer did not make a finding as to when [decedent] had acute blood loss. Dr. Starer did not make a finding as to when [decedent] had a hematoma. Dr. Starer has not made a determination as to how much sooner the hematoma could have been diagnosed.
>
> Moreover, . . . Dr. Starer does not offer any opinions on the type of interventions that would have been available . . . to address the hematoma. Dr. Starer

---

a substantial factor in producing the ultimate result." 119 N.J. at 108 (citing Evers v. Dollinger, 95 N.J. 399, 417 (1984)).

A-1194-19

> could not say that the type of treatment available upon earlier diagnosis would have been different from that which was ultimately rendered to [decedent].

The judge did not misapply the proper causation analysis nor did he improperly place the burden of proof upon plaintiff. In an increased risk case, the burden remains on the plaintiff to establish in the first instance that "defendant's negligence was a substantial contributing cause of the injury." Koseoglu v. Wry, 431 N.J. Super. 140, 158 (App. Div. 2013) (citing Verdicchio, 179 N.J. at 25). The burden shifts to the defendant only on the issue of "apportionment of damages between his conduct and any pre-existing condition." Ibid. (citing Verdicchio, 179 N.J. at 37).

The judge correctly recognized the shortcomings of the experts' opinions based upon their lack of qualifications and admitted lack of expertise. Neither had the ability to address, except in broad generalities untethered to the facts of the case, how a delay in the diagnosis of a hematoma or pseudoaneurysm increased the risk of harm to plaintiff and led to her death.

With one exception, which we explain below, we affirm the grant of summary judgment to defendants substantially for the reasons expressed by the judge in the written decision that accompanied his September order.

IV.

16

As noted, RWJ's notice of motion for summary judgment specifically excluded plaintiff's claims regarding defendant's alleged failure to properly treat and prevent a pressure ulcer during her hospitalization at defendant's institutions. In its brief supporting the motion, RWJ reiterated that it was not seeking summary judgment on this claim.

During oral argument on the motions, plaintiff understandably never addressed the issue. RWJ's counsel did not either, except in the broadest terms, noting the causation arguments raised by co-defendants and arguing "everything flows from . . . the alleged negligence with regard to the pseudoaneurysm or hematoma and . . . if causation hasn't been shown with regard to that, . . . [plaintiff] failed to prove causation required as to all the other claims."

In a footnote in his comprehensive written decision disposing of the motions, the judge took note of his earlier July order, in which he preserved the right of SLS and RWJ to bar Dr. Starer as an expert on nursing care after a N.J.R.E. 104 hearing. The judge noted defendants' earlier motion "did not raise the causation issue." He further wrote that for the present motions, the court assumed arguendo that Dr. Starer was "qualified to render the opinions he proffer[ed]; however, . . . his report and opinions . . . are devoid of any valid, substantial facts and admissible expert opinion on the critical element of

causation."  In a second footnote, the judge agreed with SLS that the previously ordered N.J.R.E. 104 hearing "ha[d] no bearing on . . . the demonstrated lack of expert opinion across-the-board on the critical element of causation."  However, the judge only analyzed the causation issue as it applied to the development of the hematoma or pseudoaneurysm in plaintiff's groin and the need for surgery versus conservative treatment of the condition.

When plaintiff moved for reconsideration, the following colloquy occurred between plaintiff's counsel and the judge:

> Counsel: Your Honor, we believe, respectfully, that with regard to the pressure ulcer case, which was a separate case essentially within this case against [RWJ], that the Court may have inadvertently thrown out the baby with the bath water. The opinion doesn't specifically address that aspect of the case and —
>
> . . . .
>
> Judge: The pressure ulcer was the last of the continuum of complications that arose from the outset of the . . . treatment that was alleged to have been malpractice.
>
> . . . .
>
> Counsel: We believe it's a separate action entirely because of the fact that the case — the pressure ulcer went from a stage 2 to an unstageable pressure ulcer case in and of itself is a separate issue from the hematoma.

Judge: But there was no — there was no opinion that that was the case.

Counsel: Dr. Starer's opinion, Your Honor.

Judge: [B]ut fatally, Dr. Starer, even assuming he was qualified to render an opinion about the nursing care aspect of it, couldn't make the causal connection.

Counsel: Well, as to the — as to the pressure ulcer we believe he did . . . . As to the hematoma and the pseudoaneurysm, Your Honor was quite thorough in analyzing that issue and I believe that that was the bulk of the issues.

The judge reiterated that plaintiff failed to produce

that causal link from finding a standard of care that was deviated from, that the deviation was a substantial factor in producing the ultimate outcome here . . . and . . . you never get to the question as to whether or not the pressure ulcers as a residual manifestation of a complication post-surgery was itself the efficient cause of the death or contributed towards it . . . .

The judge cited a footnote in his written opinion deciding the earlier motions, in which he outlined plaintiff's claims, including "the development of a pressure ulcer that contributed to her death." The judge entered the October order denying reconsideration, concluding that he had not overlooked nor failed to appreciate probative evidence in deciding the summary judgment motions. See, e.g., Triffin v. SHS Grp., LLC, 466 N.J. Super. 460, 466 (App. Div. 2021) (noting reconsideration is only appropriate when the court's decision is

"palpably incorrect or irrational," or the court "did not consider, or failed to appreciate the significance of probative, competent evidence" (quoting Cummings v. Bahr, 295 N.J. Super. 374, 384 (App. Div. 1996))).

Plaintiff raises several arguments in urging us to reverse summary judgment in favor of RWJ on her claim of malpractice regarding the sacral pressure ulcer that developed during Sebastian's hospitalization.[6] She contends that the judge's sua sponte grant of summary judgment on this discrete claim violated her due process rights, that Dr. Starer is qualified to render opinions on the subject of nursing care, or, alternatively, the court should have conducted the N.J.R.E. 104 previously ordered, and, ultimately, that she presented a prima facie case that should have survived summary judgment.

RWJ contends based on all the motions filed plaintiff was on notice that defendants were challenging every claimed injury Sebastian suffered because of a lack of expert testimony regarding causation. It contends that Dr. Starer's

---

[6] In relation to the pressure ulcer injury, plaintiff's brief only addresses RWJ's alleged negligence. We deem the claim waived as to SLS or any other defendant. See, e.g., N.J. Dep't of Env't Prot. v. Alloway Twp., 438 N.J. Super. 501, 505 n.2 (App. Div. 2015) ("An issue that is not briefed is deemed waived upon appeal." (citing Fantis Foods v. N. River Ins. Co., 332 N.J. Super. 250, 266–67 (App. Div. 2000))).

opinions were merely net opinions, and, therefore, the previously ordered N.J.R.E. 104 hearing was unnecessary. RWJ argues the judge correctly determined that the pressure ulcer claim failed for lack of expert causation evidence.

"The net opinion rule is a 'corollary of [N.J.R.E. 703] . . . which forbids the admission into evidence of an expert's conclusions that are not supported by factual evidence or other data.'" Townsend v. Pierre, 221 N.J. 36, 53–54 (2015) (alteration in original) (quoting Polzo v. Cnty. of Essex, 196 N.J. 569, 583 (2008)). "An expert's conclusion 'is excluded if it is based merely on unfounded speculation and unquantified possibilities.'" Id. at 55 (quoting Grzanka v. Pfeifer, 301 N.J. Super. 563, 580 (App. Div. 1997)).

Dr. Starer's report described in detail the standard of care, RWJ's deviation from that standard, and the injuries that resulted:

> [T]he staff of [RWJ] failed to ensure that [decedent] received appropriate routine medical and nursing care . . . .
>
> The failure of the staff of [RWJ] to comply with the applicable standards of care caused, within a reasonable degree of medical certainty, [decedent] to suffer a skin wound. This injury to [decedent] could have, within a reasonable degree of medical certainty, been prevented or detected/addressed earlier if the standards of care had been followed. It should have been clear to the staff of [RWJ] that [decedent's] condition was not improving

under the care and treatment plan and they should have made necessary changes in [decedent's] care and treatment . . . [and] should have ensured that [decedent's] skin was not subjected to friction and shearing forces and that she was turned and repositioned frequently enough to prevent skin damage and promote healing.

The failure of the staff of [RWJ] to meet the standards of care for skin care resulted in the deterioration of the integrity of [decedent's] skin, causing pain and suffering . . . [and] resulted in a decline in [decedent's] clinical condition. As a result of the staff of [RWJ] not properly addressing the external forces which can damage skin, [decedent's] skin condition deteriorated . . . [and] caused pain, suffering, clinical deterioration, and substantially contributed to her death.

At his deposition, Dr. Starer testified that Sebastian had numerous comorbidities including dementia of the Alzheimer's type, and before the hospitalization, high blood pressure, hypolipidemia, coronary atherosclerosis, arthritis, hypothyroidism, cervical disc disease, lower back pain, two rib fractures, and she was diagnosed at the hospital with atrial fibrillation. Dr. Starer testified that some pressure ulcers are unavoidable and not all are due to failure to reposition the patient. He stated that his criticism of defendant RWJ was strictly related to their prevention and treatment of Sebastian's sacral pressure ulcer because Sebastian was at high risk for developing a skin ulcer.

A-1194-19

Dr. Starer stated that considering decedent's comorbidities and a recent myocardial infarction, the pressure ulcer put stress on decedent's heart because her body now had a wound that "require[d] nutrients to be brought to it and waste materials to be taken away and protein to be brought to it, this is an additional burden putting on an already damaged heart[.]" While Dr. Starer acknowledged that defendants RWJ's nurses appropriately turned and repositioned decedent every two hours as called for in the nursing treatment plan and the doctors' orders, he also stated that "as the wound began to deteriorate, there should have been a revision of that treatment plan."

We conclude that Dr. Starer was qualified to render these opinions based on his years of experience and his board certification in geriatrics. With one exception, these were not net opinions and should have vaulted plaintiff over the summary judgment threshold on this discrete claim of injury.

However, we agree with the motion judge in one respect. Dr. Starer's opinion that the pressure ulcer was a substantial factor contributing to Sebastian's death is a net opinion unsupported by requisite factual underpinnings. Dr. Starer's report contains nothing more than a conclusory statement. His deposition testimony, quoted above, describes a "cascading" series of events that culminated in Sebastian's death. However, Dr. Starer was

23

unable to explain how given all her other ailments, a small pressure wound on Sebastian's sacral skin area was a <u>substantial</u> contributing factor of her death. <u>See, e.g.</u>, <u>Verdicchio</u>, 179 N.J. at 25 ("[M]erely establishing that a defendant's negligent conduct had some effect in producing the harm does not automatically satisfy the burden of proving it was a substantial factor[.]")  We have carefully examined the record, and there is nothing but conclusory statements to support the opinion that a small sacral pressure ulcer was a substantial factor in causing Sebastian's death.

In sum, we partially reverse the September and October orders only as to RWJ and only as to plaintiff's claim for Sebastian's pain and suffering caused by the sacral pressure ulcer that allegedly resulted from RWJ's negligence.  In all other respects, we affirm those orders that resulted in summary judgment in defendants' favor.  We dismiss SLS's cross-appeal as moot.

Affirmed in part; reversed in part; and remanded.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1194-19