**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4953-17T1

ILANA PERETZ, as Administrator
of the Estate of AVIV PERETZ,
ILANA PERETZ and MEIR PERETZ,
as Administrators Ad Prosequendum
for the Estate of AVIV PERETZ,
and MEIR PERETZ, individually,

     Plaintiffs-Appellants/
     Cross-Respondents,

v.

RUDRANI K. BELNEKAR, M.D.
and CENTRAL JERSEY EMERGENCY
MEDICINE ASSOCIATES, PC,

     Defendants-Respondents/
     Cross-Appellants,

and

ALYSSA LICATA, R.N.,
CENTRASTATE HEALTHCARE
SYSTEM, d/b/a CENTRASTATE
MEDICAL CENTER, and
DONNA DOLCEMASCOLO, R.N.,

     Defendants-Respondents.

Argued January 28, 2020 – Decided May 15, 2020

Before Judges Yannotti, Currier, and Firko.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Docket No. L-0144-15.

David A. Mazie argued the cause for appellants/cross-respondents (Mazie Slater Katz & Freeman, LLC, attorneys; David A. Mazie, David M. Freeman, and David M. Estes, on the briefs).

Robert A. Giannone argued the cause for respondents/cross-appellants Rudrani K. Belnekar, M.D. and Central Jersey Emergency Medicine Associates, PC (Ronan, Tuzzio & Giannone, attorneys; Robert A. Giannone, of counsel and on the briefs).

Richard J. Mirra argued the cause for respondents Alyssa Licata, R.N., Centrastate Healthcare System, d/b/a Centrastate Medical Center and Donna Dolcemascolo, R.N. (Hoagland, Longo, Moran, Dunst & Doukas, LLP, attorneys; Thomas B. Leyhane, of counsel; Richard J. Mirra, on the brief).

PER CURIAM

In this tragic case, arising out of the death of their son Aviv[1] following an allergic reaction, plaintiffs Ilana and Meir Peretz appeal from the denial of their

---

[1] As plaintiffs share the same last name, we refer to them individually by their first names for clarity and collectively as "plaintiffs."

motion for new trial.[2]  In their cross-appeal, defendants contend the trial court erred by barring the admission of certain evidence.  After a careful review of the record in light of the arguments advanced on appeal and the applicable principles of law, we affirm on the appeal and dismiss the cross-appeal.

I.

We derive the facts from the testimony presented at trial.  At the age of three months, Aviv was diagnosed with a dairy allergy, resulting in "allergic episodes" two to three times a year.  He also had a history of asthma.

Although Aviv was prescribed an EpiPen[3] and possessed one, neither he nor any family member had ever used an EpiPen to treat his allergic reactions. Instead, Aviv always went to a hospital for treatment.  The family lived four miles from CentraState Medical Center (CentraState) and Ilana estimated that Aviv was treated there at least ten times for allergic reactions.

On June 3, 2014, Aviv was seventeen years old and resided with Ilana and Meir in Manalapan.  After having dinner at home with his parents and brother,

---

[2]  Ilana and Meir are Aviv's guardians ad litem and the administrators of his estate.  Meir also asserts an individual claim for his emotional distress.

[3]  An EpiPen is a disposable, pre-filled automatic injection device that delivers the drug epinephrine for the emergency treatment of a severe allergic reaction. An EpiPen contains a single 0.3 mg dose of epinephrine.

A-4953-17T1

Aviv ate several bites of a cookie. When he started to feel his throat tingle, he read the box and discovered there were dairy products in the cookie.

Within several minutes, Meir and Aviv headed to the hospital. Before they left, Ilana gave Aviv his EpiPen and Aviv took Benadryl. On the way to CentraState, Meir had to pull his vehicle to the side of the road for Aviv to vomit. Meir did not observe any other symptoms and he stated Aviv told him he only had the tingling in his throat. Meir estimated it took them ten minutes to get to the hospital that night.

Meir dropped Aviv at the emergency department entrance and then parked his car. When Meir entered the hospital, he caught up with Aviv who was walking with a nurse to a room in the acute care portion of the emergency department.

At his deposition, Meir stated he and Aviv were sitting in the room and nobody came in to administer any treatment. Meir stated Aviv was "slowly . . . [having] difficulty breathing" and Meir thought his condition was getting worse. Meir testified that after Aviv told him he could not breathe, Meir started screaming for someone to help. He said they were still alone in the room when he saw Aviv lay back down on the bed and turn blue. Meir did not recall anything after that other than being escorted out of the room by a nurse. He

4

called Ilana and told her to come to the hospital. Later, a doctor told the family that Aviv was "very, very sick" and they were transferring him to St. Peter's Hospital University Hospital.

According to the CentraState medical records, Aviv entered the emergency room at 9:39 p.m. He told the triage nurse he had consumed a cookie containing dairy thirty minutes before his arrival at the hospital. He informed the nurse he had a dairy allergy and asthma and he had not used his EpiPen. Aviv was taken to "the resuscitate room" by 9:42 p.m.

Defendants Donna Dolcemascolo, R.N. and Alyssa Licata, R.N. were the registered nurses assigned to Aviv's room. The nurses placed an IV and drew blood before defendant Rudrani Belnekar, M.D.[4] came into the room at 9:43 p.m. The doctor and nurses knew about Aviv's dairy allergy and history of asthma from his intake records. Aviv told Belnekar "he had a sensation of his throat closing" and "he felt short of breath." Aviv's speech was "clear," but he "appeared to be anxious."

According to Belnekar, she ordered albuterol, solu-medrol, and epinephrine at 9:45 p.m. Albuterol is used to treat asthma by alleviating

---

[4] Belnekar was an employee of defendant Central Jersey Emergency Medicine Associates, PC.

wheezing and bronchial constriction. Solu-medrol is a steroid used to reduce inflammation. Epinephrine is administered to reverse the symptoms of anaphylaxis – a severe allergic reaction. The epinephrine was injected subcutaneously into Aviv's skin in the area of the deltoid (the shoulder muscle) at 9:45 p.m.

The parties disagree about how much epinephrine was administered to Aviv. The standard of care requires a dosage of 0.3 mg of epinephrine. The medical records reflect that Belnekar ordered 0.03 mg of epinephrine but Aviv was given 0.3 mg of epinephrine. Belnekar said the entry of 0.03 mg was a clerical error. Dolcemascolo testified that Belnekar gave a verbal order of 0.3 mg of epinephrine and that is what she administered to Aviv. Licata confirmed she witnessed Dolcemascolo give 0.3 mg.

At approximately 10:03 p.m.,[5] Aviv suffered a seizure. During the seizure, Aviv stopped breathing, his "color changed to blue," he was

---

[5] The parties dispute the timing of the seizure. Plaintiffs' pediatric emergency medicine expert, Karen Santucci, testified: "It is a little bit difficult to say from the documentation. But I believe it was about 22:02, 22:03." Belnekar, Dolcemascolo, and Licata recalled the seizure occurring two minutes after the epinephrine was administered.

unresponsive, and his oxygen saturation began to drop. Respiratory and anesthesiology specialties were paged.

Belnekar testified she needed to establish an airway to give Aviv assisted breathing and oxygen. However, because Aviv's jaw was clenched, Belnekar had difficulty opening it and it took her some time. Once Belnekar got Aviv's jaw open, she placed an oropharyngeal airway – a curved tube – down Aviv's throat, and began to bag[6] him, allowing air to enter his lungs. Belnekar stated the oxygen saturation level rose, indicating Aviv was moving air in and out of his lungs. The chart reflects Aviv was given Ativan – an anti-seizure medication – at 10:04 p.m.

An anesthesiologist arrived to intubate Aviv because he was still unresponsive and could not maintain his airway on his own. During the intubation process, Aviv went into cardiac arrest. At 10:12 p.m., a code[7] was called for the cardiac arrest. Aviv was in cardiac arrest for thirteen minutes until

---

[6] "Bagging" was described as the procedure where healthcare personnel use an ambu-bag, which is a mask attached to a reservoir of air. A doctor or nurse squeezes the bag to force air into the lungs of a patient who is not able to inhale on their own. The bag is connected to oxygen to increase the oxygenation of the blood supply.

[7] A "code" is a term used for a patient in respiratory or cardiovascular collapse.

A-4953-17T1

he was resuscitated by advanced cardiac life support. During that time, Aviv was deprived of oxygen. He received several additional dosages of epinephrine.[8]

Once Aviv was stabilized, the decision was made to transfer him to St Peter's for more specialized care. Licata needed to speak to both the nurse who would be accompanying Aviv, and the staff at St. Peter's to provide all of the information regarding Aviv's condition and care.

Because the doctor and two nurses had been with Aviv continuously since his arrival in the emergency department, Licata realized there was "nothing" in Aviv's chart. She stated she had to "recap" everything that had occurred as the chart would accompany Aviv to St. Peter's. Licata finished updating Aviv's chart and gave it to the transfer nurse at 10:54 p.m. Belnekar prepared a summary of the events as well. Both Belnekar and Licata stated the times entered in the chart were not exact, and they gave the times "to their best of their recollection."

Due to the lack of oxygen during the cardiac arrest, Aviv suffered a permanent brain injury, leaving him in a vegetative state. He was treated at St.

---

[8] Epinephrine is administered during a code to jumpstart the heart.

A-4953-17T1

Peter's from June 3, 2014 until he was transferred to Voorhees Pediatric Facility on November 3, 2014.

While Aviv was at St. Peter's, Ilana came every day and helped the staff change and bathe him. Meir visited Aviv every day from June to August 2014 and then every other day starting in September 2014.

After Aviv was transferred to Voorhees, Ilana and Meir took turns visiting their son each day. Ilana assisted Aviv's nurses in caring for him and accompanied him to doctors' appointments. Aviv passed away on June 5, 2017.

## II.

In January 2015, plaintiffs instituted suit against Belnekar and Licata, alleging claims of negligence in their provision of medical care to Aviv. CentraState was also named as a defendant under the theories of respondent superior and agency. A second amended complaint added an emotional distress claim for Meir individually. Defendants Central Jersey Emergency Medicine Associates and Dolcemascolo were named in a third amended complaint. After Aviv's death, plaintiffs amended the complaint a fourth time, adding Ilana and Meir as the administrators of the estate and asserting claims of wrongful death and survivorship.

A-4953-17T1

## III.

## A. Trial

The case was tried before a jury, between January 29, 2018 and February 15, 2018. Prior to the opening statements, plaintiffs' counsel moved to bar defendants from "blaming" Aviv and his parents for not using the EpiPen before he went to the hospital on June 3, 2014. Defendants contended the nonuse of the EpiPen was relevant to and necessary for the jury's consideration of the issue of proximate cause. They asserted Aviv's dairy allergy was a pre-existing condition and the jury would hear expert testimony from all parties on the importance of the early administration of an EpiPen to an anaphylactic patient.

The trial judge noted the motion had only been filed the previous day, and he had not heard any evidence yet, therefore he lacked any context in which he could make an appropriate ruling. He advised that if an objection was made as the trial progressed, he would make his ruling. In the meantime, the judge instructed defendants they could not argue that Aviv or his parents bore any fault for the events.

On the same date, plaintiffs objected to the introduction of certain documents. After arguments on the issue over several days, the judge sustained

the objection.  The barring of the admission of these documents is the subject of defendants' cross-appeal.

## B. Plaintiffs' Case – Witness Testimony

We briefly summarize other testimony that is relevant to the issues presented on appeal.

Karen Santucci, M.D. testified as plaintiffs' expert in pediatric emergency medicine.  She reviewed with the jury the medical records of Aviv's treatment at CentraState on June 3, 2014, noting the medical personnel recognized Aviv was having a severe allergic reaction – he was anaphylactic.

Santucci testified that the standard of care required Belnekar to administer 0.3 mg of epinephrine intramuscularly into Aviv's lateral thigh.  She explained that the quickest absorption of the epinephrine occurs with its injection into a "large muscle belly" – the lateral thigh.

Therefore, she opined that Belnekar deviated from the standard of care when she ordered the injection of epinephrine "subcutaneously, into the skin in the area of the deltoid."  Santucci stated an injection of epinephrine into the skin took much longer for the medication to build up in the body's vascular system and was therefore less effective than if injected into a muscle.

A-4953-17T1

Santucci opined that if Aviv was given the proper dosage of epinephrine to the lateral thigh it would have "reversed [his] signs and symptoms of anaphylaxis . . . ." She stated that generally the effects of the medication can be seen within a minute or two.

Santucci further opined that the standard of care required Belnekar to give Aviv a second dose of epinephrine between five to fifteen minutes after the first injection. If the symptoms did not abate, a third dose was required to be given five minutes after the second. She stated that Aviv was not given a second dose of epinephrine until 10:15 p.m., a half hour after the first dose and after he had the seizure.

Despite Aviv's nonuse of the EpiPen, Santucci testified there was "ample opportunity to give the medication appropriately and for the medication to reverse the signs and symptoms of anaphylaxis and save his life." During cross-examination, Santucci agreed with the importance of the speed in administering the drug. We note the following colloquy:

> Q: The most important step to take in the treatment of an allergic reaction is the administration of epinephrine?
>
> A: That's correct.
>
> Q: Agreed? And the prompt and rapid treatment with an EpiPen is paramount --

A: Correct

Q: -- very important?

A: That's correct.

. . . .

Q: And the failure to inject epinephrine promptly has been identified as the most important factor contributing to death in patients with this disorder, correct?

A: That's correct.

. . . .

Q: And it's also true that patients with -- or the fact that Aviv also had asthma, that put him into an even higher risk for severe anaphylaxis and a potential fatality, did it not?

A: That's correct.

Q: You agree that because of all of those reasons and your responses to those questions, what you want is the use of an EpiPen within the first [thirty] minutes of the reaction to whatever the allergen is, correct?

A: What I want is the use of epinephrine appropriately as soon as possible. Correct.

Q: And that is why EpiPens are dispensed, so they can use it as soon as possible after contact with the allergen, correct?

A: Correct.

13

. . . .

> Q:  And you would agree, would you not, that if epinephrine was administered while Aviv was still at home, it's most likely that the outcome would have been much better?  You'd agree to that?
>
> A:  I think if the epinephrine had been administered, there is a good chance he would -- well, you always still come to the hospital after the administration of epinephrine.  But I think -- I think the outcome would have been better.  Yes.

Joyce Foresman-Capuzzi, R.N. testified "as an expert in nursing care in the emergency department."  She opined that Aviv "was in the thro[es] of anaphylaxis when he walked into the [CentraState] emergency department" and that "time [was] of the essence," because the nurses were aware he had not used his EpiPen.

Capuzzi agreed with Santucci that the standard of care for a patient in anaphylaxis was the administration of 0.3 mg of epinephrine intramuscularly to the side of the thigh.  Capuzzi concluded that an incorrect dose of epinephrine was given to Aviv and it was delivered in an improper manner.  The expert further opined that Dolcemascolo breached the standard of care by not questioning Belnekar's order to inject the drug subcutaneously into the deltoid.  She stated the nurses also should have advised Belnekar to give a second dose of epinephrine when five minutes had passed without any change in Aviv's

14

condition. Capuzzi said Licata breached the standard of care when she documented the epinephrine dose as 0.03 mg if Aviv was given the proper 0.3 mg dosage.

Capuzzi conceded during cross-examination that Licata changed the chart when she was preparing it for transfer to reflect that Aviv was given 0.3 mg of epinephrine. She also agreed that Dolcemascolo testified she administered 0.3 mg. Capuzzi also confirmed it was not unusual in a crisis situation to find time discrepancies in a medical chart. Because the nurses' first priority is caring for the patient, they often go back and make estimations in the chart of when events occurred.

As discussed above, Ilana testified about what occurred before Aviv and Meir left for CentraState on June 3, 2014 and described her time with and observations of Aviv following his transfer to the two other facilities. During Ilana's testimony, plaintiffs' counsel sought to introduce two photographs and a video of Aviv taken during his stays at St. Peter's and Voorhees. Counsel proffered the photos to establish damages for Meir's emotional distress and Aviv's pain and suffering. Defendants' objection was sustained because the trial court did not find the photographs and video were relevant during Ilana's

testimony. The judge found it appropriate to reintroduce the video and photographs during Meir's testimony.

Plaintiffs' counsel also inquired of Ilana whether she noticed Aviv responding to her voice or whether there was any interaction with him when he was in St. Peter's or at the Voorhees facility. Defendants objected, arguing that it was improper lay opinion testimony. They contended expert testimony was required to inform the jury whether Aviv was "medically capable of experiencing pain or showing a reaction to activities that were taking place in his [hospital] room." The trial judge sustained the objection, finding it was improper as it lacked the support of expert testimony. He described the proffered testimony as "emotional speculation." In addition, the testimony was barred under N.J.R.E. 403 as it was more prejudicial than probative.

On cross-examination, defendants questioned Ilana about Aviv's dairy allergy, his visits to various hospitals to treat the allergic reactions, and his EpiPen. Ilana was questioned specifically about an allergic reaction Aviv had at a relative's home in Brooklyn, New York; a reaction in 2004 when the family took Aviv to CentraState; an episode in 2009 when Aviv was taken to CentraState after the family had taken him to the doctor's office; and allergic

reactions in March and September 2010, October 2011, October 2012, and May 2013 – for which Aviv was treated at CentraState.

Ilana could not remember specific details of most of the allergic episodes. She did not know if Aviv had his EpiPen with him on the prior occasions. She did not know if Aviv or any family member ever used the EpiPen following any of the allergic reactions. Ilana did not recall ever being instructed by hospital staff to either call 9-1-1 or to use an EpiPen upon experiencing any symptom of the dairy allergy.

Plaintiffs' counsel objected to defendants' line of questioning, arguing the circumstances of Aviv's other allergic reactions were irrelevant. The trial court overruled the objections, finding the questioning was relevant to the issue of proximate cause. Plaintiffs' counsel asserted this was not a Scafidi[9] case because defendants had not provided any expert testimony as to an allocation of fault between a pre-existing condition and any negligence of defendants.

Plaintiffs also presented Paul Greenberger, M.D. as an expert in allergy-immunology to testify as to the effects of treatment of severe allergic reactions and anaphylaxis. He opined epinephrine should be injected intramuscularly into

---

[9] Scafidi v. Seiler, 119 N.J. 93 (1990).

A-4953-17T1

the front side of the thigh because it is absorbed into the body's bloodstream more effectively than if the injection is given under the skin.

The expert noted the differing notations in the chart regarding the dosage of epinephrine given to Aviv – 0.03 or 0.3 mg.  If Aviv was only given 0.03 mg of epinephrine, Greenberger stated that dosage would not have any effect because it was one-tenth the recommended dose of 0.3 mg.  He testified that if Aviv was administered 0.3 mg of epinephrine intramuscularly into his thigh at 9:45 p.m., it would have helped his breathing and improved his condition overall.  He also opined that if Aviv had received a second dose of epinephrine five minutes after the first, it would have reversed his symptoms, stopped the reaction, prevented the seizure and Aviv would be alive.

Although Greenberger testified it would have been beneficial for Aviv to use his EpiPen, he opined it would not have changed the outcome because Aviv was not administered the required dosage of 0.3 mg of epinephrine intramuscularly at 9:45 p.m. and at 9:50 p.m.  The expert described Aviv as "treatable" and "savable" when he presented to the emergency department.

During cross-examination, Greenberger agreed the use of the EpiPen would not only have been helpful but would have stopped the allergic reaction.

He further stated the recommendation is for a person to use an EpiPen immediately upon the start of symptoms.

The expert further conceded that Aviv's nonuse of the EpiPen resulted in a worsening of his condition over the thirty minutes between the ingestion of the cookie and his arrival at the hospital. The doctor agreed the nonuse of the EpiPen increased Aviv's risk of harm. He also confirmed that the failure to give epinephrine as soon as symptoms appear is identified as the most important factor contributing to death from anaphylaxis.

Defense counsel also discussed the medical chart with Greenberger. The expert agreed Aviv was seen by Belnekar and the two nurses within a few minutes of his arrival at the emergency department. Greenberger stated the chart did not reflect that Aviv was in the acute care room for a half hour before any medical staff attended to him.

On February 6, 2018, the ninth day of trial, just prior to plaintiffs' final witness, plaintiffs' counsel made a request for the court to give the jury a limiting instruction concerning the narrow purpose for which the jury could consider the nonuse of the EpiPen. He also requested the court prohibit defendants from any further discussion or questioning of Aviv's history of allergic reactions as it was prejudicial and cumulative.

 A-4953-17T1

Defense counsel responded that plaintiffs' counsel had asked Ilana and other witnesses about the prior episodes of allergic reactions and anaphylaxis. They agreed they could not assert any negligence on the part of Aviv or Meir with respect to Aviv's ultimate injuries and death. However, because Meir had an individual claim for his emotional distress, the nonuse of the EpiPen could be relevant if Meir had been instructed to take certain actions and failed to do so. They argued that Meir's "conduct in contributing to his own damages is relevant." The judge declined to issue the proposed limiting instruction at that time, finding it was too broad and not warranted at the particular point in the trial.

Meir was the final witness to testify in plaintiffs' case-in-chief. As stated above, Meir recounted the events at his home prior to leaving for CentraState, the drive to the hospital, and his observations of Aviv's care and treatment at the hospital. Meir stated he could not stop thinking about Aviv turning blue and appearing as if he was "taking [his] last breath or two or three." Meir also stated: "I have no excitement. I am numb, numb inside. There is nothing inside of me that can let me feel any better or look in the future and say this is what I want. There is nothing."

A-4953-17T1

Meir testified he sought counselling with a therapist in January 2016 to discuss what he witnessed on June 3, 2014. However, despite the counselling, Meir said he could not "forget that night" and that the images would "haunt [him] until the day [he] die[d]."

During cross-examination, Meir stated he was seeking to recover damages for emotional distress because the CentraState staff did not treat Aviv with urgency. He conceded he had previously stated in his deposition that no one had treated Aviv for thirty minutes. After listening to the testimony during trial, Meir stated he now realized Aviv was treated within several minutes of arriving at the hospital. Meir did not recall seeing Aviv get any injections and, therefore, he did not know the dosage of the medications or how the medication was given.

Plaintiffs' case also included readings of portions of the depositions of Belnekar, Licata, Dolcemascolo, and nurse anesthetist Tom Westerman who intubated Aviv after his seizure at CentraState.

Following the completion of the presentation of evidence in plaintiffs' case, defendants moved to dismiss Meir's emotional distress claim. Defendants argued the claim was not established under Frame v. Kothari[10] because Meir did not witness the alleged malpractice of Aviv not receiving the appropriate dose

---

[10]  Frame v. Kothari, 115 N.J. 638 (1989).

of epinephrine in the correct location. Instead, Meir's emotional distress claim was premised on his recollection that no one attended to Aviv for thirty minutes after their arrival in the emergency department and there was a lack of urgency.

Plaintiffs opposed the motion, contending Meir witnessed the malpractice because he was with Aviv the entire time in the emergency department and he saw that Aviv was not getting the medication he needed to save his life. In addition, Meir connected the malpractice to Aviv's ultimate injury because he witnessed him unable to breathe. The judge requested briefing on the issue and stated he would rule on the motion after a review of the briefs and applicable case law.

After his review, the judge granted defendants' motion. In his reasoning, the trial judge referred to Frame and Gendek v. Poblete, 139 N.J. 291 (1995), noting the four factors needed to establish an emotional distress claim in a medical malpractice setting.

The judge cited Meir's testimony in which he stated his emotional distress was based on the lack of urgency in the emergency department and that he felt Aviv was not treated properly. The judge noted Meir had not seen Aviv receive the injection of epinephrine and therefore did not know if it was the correct dosage or given in the proper part of the body. The judge found Meir's grief

was a generalized grief to be expected after the loss of a loved one, not the emotional distress "associated with the lost chance of survival caused by any of the [d]efendants' negligence." Because Meir had not established an emotional distress arising out of medical negligence that he observed, the judge dismissed the claim.

## C. Defendants' Case – Witness Testimony

Belnekar recalled getting a phone call from a nurse informing her there was a seventeen-year-old patient with an allergic reaction in the emergency department. She stated she was in Aviv's room within a minute of receiving the call. After her initial assessment of Aviv, Belnekar went to the medication room directly outside Aviv's room and gave the order to the nurse for epinephrine, solumedrol, albuterol, and pepcid. She stated the nurse was already collecting the medications and immediately left with the epinephrine. Belnekar stated she did not tell the nurse how to administer the epinephrine because the standard at CentraState was to inject it subcutaneously. Belnekar sat at the computer to put in her orders. The order for epinephrine was timed in the computer at 9:49 p.m. Belnekar could see into Aviv's room from her position at the computer.

Belnekar's verbal order to the nurse was 0.3 mg – the standard dose of epinephrine for anaphylaxis and allergic reactions. In discussing the notation of

A-4953-17T1

0.03 mg dosage of epinephrine in the chart, Belnekar stated it was a mistake; she clicked on the wrong entry in the drop-down menu as she was entering her orders into the chart. She advised the epinephrine had already been administered before she completed the chart. In addition, she stated that under the portion of the chart entitled "Medication given," it noted "Epinephrine, 0.3 milligram[s], subcutaneous, right deltoid."

Belnekar disagreed that the standard of care in 2014 required the administration of epinephrine intramuscularly, explaining there was "no consensus" about how epinephrine should be administered. Because Aviv's blood pressure and perfusion were good, Belnekar stated the medication would be absorbed and start working.

However, Belnekar described that "within two minutes of Epinephrine administration, . . . Aviv . . . started having seizures." She described the measures she took to establish an airway. After she intubated and bagged him, Aviv's color returned, and his oxygen saturation levels rose.

Because the seizure occurred within two minutes of the first dose of epinephrine, Belnekar told the jury there was no indication to give Aviv a second dose. The purpose of epinephrine is to increase the blood pressure and open the airway. Belnekar explained both purposes were accomplished because Aviv's

24

blood pressure was already high (170/107) and bagging him increased his oxygen levels. She stated a second dose of epinephrine at that time would be "overdosing him" and "dangerous."

Belnekar further explained that when epinephrine is given intramuscularly, it peaks at a certain level and then goes down. So it has to be given more frequently. In contrast, according to Belnekar, if epinephrine is given subcutaneously, there is a constant supply of the medication to have a sustained effect. Because it remains longer in the vascular system, the dosage does not have to be repeated as frequently as if administered intramuscularly.

Thomas Rebbecchi, M.D. testified as an expert in emergency room care. The doctor referred to the triage note that Aviv presented in the emergency department with wheezing, he was sweating and appeared anxious. Aviv also told the staff he was short of breath. Although Aviv did not mention it, the staff later learned he had vomited en route to the hospital. Given this description of symptoms, Rebbecchi stated Aviv was "in the middle of a severe allergic reaction" or anaphylaxis. He concurred that "epinephrine is the drug of choice," and "[t]he earlier a patient [receives] it, the better . . . ." However, he did not know if an earlier dose of epinephrine would have been effective. He continued,

explaining there are "lots of things going on in the body" during an allergic reaction and epinephrine is not always 100% effective.

Rebbecchi opined that the standard of care in 2014 was "[e]xactly what [was done] at CentraState" – the administration of epinephrine and the other medications. The standard of care did not dictate by which route the epinephrine had to be given – both intramuscular and subcutaneous administrations were acceptable.

In Rebbecchi's opinion, Belnekar complied with the accepted standards of care in her treatment of Aviv. He said the medical staff immediately treated Aviv and reacted correctly when his condition worsened. He did not "see any lapse of time." Further, Rebbecchi opined that additional doses of epinephrine would not have made a difference because the first dose of epinephrine and the other "rescue medications" were not effective. A subsequent dose would not have changed Aviv's deteriorating condition requiring an active airway management. The doctor opined that the eventual outcome would not have changed even if epinephrine was given intramuscularly or if Aviv had received multiple doses.

When asked if the outcome would have changed if Aviv had received epinephrine in the first thirty minutes after eating the cookie, Rebbecchi

A-4953-17T1

responded: "I don't know. What we know about epinephrine is, that it interrupts that cascade of events that's happening; and we know that the earlier, the better. If he had gotten it, I don't know. If it would have changed the outcome, it could have; it's impossible to know." He explained it was impossible to know because the reaction of a person to an allergen is difficult to predict. He stated that when the onset of symptoms from a food allergy is rapid, the consequences are more severe. In addition, the first dose of epinephrine given in the emergency department did not improve Aviv's symptoms and condition.

Jody Tversky, M.D. testified as an expert in "anaphylaxis, the progression of anaphylaxis, and causation with respect to Aviv Peretz's particular anaphylaxis." Tversky told the jury that Aviv had a "severe, robust and very difficult-to-treat" allergy to milk. Therefore, he had a higher risk of having a more severe reaction to any product with dairy. The doctor stated the most important factor for a good outcome is the speed at which epinephrine is delivered.

Tversky also agreed that because of Aviv's history, the nonuse of an EpiPen, and the progression of his symptoms from the time he ate the cookie to his arrival at the hospital, he was at a greater risk than the average patient for

having a poor outcome. Having asthma combined with a severe food allergy put Aviv at the greatest risk of having a very poor outcome.

The expert described anaphylaxis as "a runaway train," "a horse that gets released out of the barn," and "[o]nce that horse is out of the barn, it's really hard to get him back." The "only chance you have is to not let [the horse] out of the barn in the first place. And the only thing that can do that is a quick, swift delivery of epinephrine."

Because Aviv did not get epinephrine for at least thirty minutes after he ate the cookie, Tversky opined that nothing else could have been done for Aviv to change the outcome that evening. He advised that the "impact of a second or third dose greatly depends on the timing of the first dose in relation to the onset of symptoms." Therefore, he opined that "[a]fter [Aviv's] arrival to the emergency department, I do not believe with any degree of medical certainty that anything else would have changed the outcome of th[e] progression" of Aviv's anaphylaxis.

Nurse Kimberly Mikula was presented and qualified as an expert on the standard of care for an emergency room nurse. At the start of the trial, plaintiffs had presented a motion in limine to bar Mikula's testimony; the motion was denied without prejudice.

Mikula stated that the standard dose of epinephrine is 0.3 mg administered subcutaneously, and the doctor would instruct the nurse as to the specific medication, the dosage and the route by which to give it. She opined that Dolcemascolo and Licata did not deviate from accepted standards of care in: 1) "the speed with which they handled Aviv Peretz on June 3, 2014 when he arrived" in the emergency department; and 2) their communications with Belnekar about the dosage of epinephrine, or whether additional epinephrine should be given.

At the conclusion of Mikula's testimony, plaintiffs moved to strike it, asserting she did not give a consensus opinion but only a personal opinion based on her experience working in the emergency departments of four hospitals. Defendants opposed the application, stating Mikula relied on her personal and professional experience. However, after defense counsel finished his comments, he moved on to other motions made by plaintiffs' counsel, specifically their request for a ruling that the facts here did not support a <u>Scafidi</u> charge. Thereafter, counsel and the court discussed the <u>Scafidi</u> issue and the scheduling for the next day. There was no ruling on the Mikula motion.

The final witnesses were nurses Dolcemascolo and Licata who testified regarding the events of June 3, 2014. As we have referred to portions of their

testimony in our recitation of the facts, we need not repeat it here except for a few pertinent additions.

Dolcemascolo's testimony was consistent with that given by Belnekar. She stated the standard dosage and route of epinephrine was 0.3 mg subcutaneously into the deltoid muscle. That was the only concentration in a vial that was available in CentraState's emergency department.[11] Dolcemascolo stated she had never given a 0.03 mg dose of epinephrine in her sixteen years working at CentraState.

After Belnekar gave her the verbal order of "0.3 [mg] sub-q," Dolcemascolo repeated the order out loud, grabbed the various medications and administered the epinephrine. She recalled that Belnekar was out of the room no longer than thirty seconds, entering the orders at the computer station just adjacent to Aviv's room. She stated further that at least one of the three medical professionals was in the room at all times.

Licata explained that Aviv's chart was not done in real time because she and Dolcemascolo were taking care of him. She said her first entry was at 10:31 p.m., after the seizure, anesthesia, and the code. At that point, she had to recap

---

[11] Both defendant nurses testified that a 0.03 mg dosage of epinephrine was kept in the code cart and was used only on a patient in a cardiac or respiratory distress situation – when a patient is pulseless. It is used to restart the heart.

what had happened.  She also testified she saw Dolcemascolo administer the 0.3 mg dosage of epinephrine.

All of the witnesses were questioned about certain articles in medical literature.  In addition, the timeline of treatment and the timed entries in the medical chart were explored with the experts and medical professionals.

### D. The Scafidi Motion

As stated, plaintiffs' counsel objected to the inclusion of a Scafidi charge. Counsel asserted defendants had the burden under Scafidi to apportion a percentage of damages attributable to the pre-existing condition and the medical professionals' negligence.  Because there was no defense medical expert testimony that apportioned the damages in specific percentages, plaintiffs contended defendants had not met their burden.

Defendants responded that model jury charge 5.50E[12] – pre-existing condition – was exactly on point with the circumstances presented here.  They asserted that if the jury found plaintiffs would have suffered the same injuries even if defendants did not deviate from accepted standards of medical care, then defendants were not liable.

---

[12]  Model Jury Charges (Civil), 5.50E, "Pre-Existing Condition – Increased Risk/Loss of Chance – Proximate Cause" (approved Dec. 2002; revised Feb. 2004).

A-4953-17T1

In ruling that the Scafidi charge was applicable, the judge conducted a thorough review of the applicable case law. He noted Greenberger's testimony – plaintiffs' expert – that not using the EpiPen worsened Aviv's anaphylaxis during the thirty minutes between the ingestion of the cookie and his arrival at CentraState. Greenberger also stated the non-use of the EpiPen increased the risk of harm.

The judge determined Aviv had three pre-existing conditions: the milk allergy, asthma, and anaphylaxis. Although he agreed that experts present testimony in other types of cases – particularly cancer cases – in terms of percentages, the judge noted there is statistical evidence in that field of medicine that enables experts to give that testimony. The judge concluded that neither Scafidi nor any subsequent case law required an expert to express the lost chance of recovery in specific percentages. Although the experts here had argued respectively that Aviv was either savable or he was not, nevertheless there was evidence of pre-existing conditions, requiring and supporting a Scafidi charge.

### E. The Jury Charge

We discuss the portions of the jury charge pertinent to the issue on appeal. In explaining the parties' respective burdens of proof, the judge stated:

> Here, the plaintiff, the Estate of Aviv Peretz, has
> the burden of establishing by a preponderance [of the]

32

evidence, all of the facts necessary to prove that the doctor and the nurses were negligent. That they deviated from the applicable standard of care that applied to . . . the doctor and [to] the nurses. And that any deviation increased the risk of harm posed by Aviv's pre-existing condition.

Here, they have to prove that . . . was a substantial factor in producing the ultimate harm or injury . . . .

[H]ere the defendants, Dr. Belnekar, Nurse Licata and Nurse Dolcemascolo, have a burden. In that if you find that the plaintiff has proven that any of the defendants deviated from accepted standards of practice. And that th[e] deviation increased the risk of harm and was a substantial factor.

Then such defendant or defendants have the burden of proof to separate those injuries that . . . Aviv would have suffered anyway, even with proper treatment from those injuries that may have resulted from any negligence by any of the defendants.

The judge also provided the jury with the following limiting instruction as requested by plaintiffs. He stated:

Here, I want to give you what we call a limiting instruction. You have heard testimony regarding Aviv Peretz having an EpiPen in his possession on the date in question. And that he did not use it. Nor did his parents use it on Aviv.

I instruct you that the fact that the EpiPen was not used is not evidence to be considered to determine fault against any of the plaintiffs.

33

The defendants [do] not assert that Aviv Peretz or his parents were negligent in any way. And you will not be asked to decide any such claim.

The evidence that you have heard regarding the nonuse of the EpiPen, is to be considered if you find that one or more of the defendants [was] negligent. And then on the issue of whether the nonuse of the EpiPen was a factor or cause of the damage to Aviv Peretz.

In turning to proximate cause, the judge charged model jury charge 5.50E, modifying it to the facts as follows:

In this case, the concept of . . . proximate cause is . . . tailored to the fact that here, in this case, Aviv had a preexisting condition which by itself had a risk of causing him harm. The harm that he ultimately experienced in this case.

However, the plaintiff . . . the Estate of Aviv Peretz, contends that Aviv lost the chance of a better outcome because [of] the defendants' deviation from accepted standards of medical and nursing practice.

Here, Aviv had [a] severe allergic reaction, [a]sthma and anaphylaxis. However, . . . plaintiffs assert that Aviv was nevertheless treatable. And that the defendants . . . negligently treated him causing his injuries and death.

If you determine that any defendant deviated from accepted standards of medical practice or nursing practice, then you must consider whether the plaintiff has proven that the deviation increased the risk of harm posed by the plaintiff's preexisting condition.

34

You must then consider whether the plaintiff has proven that the increased risk of harm was a substantial factor in producing the ultimate harm or injury.

If the deviation was only remotely or insignificantly related to the ultimate harm or injury, then the deviation does not constitute a substantial factor.

However, such defendant or defendants' deviation need not . . . be the only cause or even a primary cause of an injury for the deviation to be a substantial factor in causing -- in producing the ultimate harm or injury.

If under all the circumstances here, in the emergency room -- emergency medical treatment of Aviv Peretz, you find that Aviv may have suffered [less] injuries if the defendants -- if a defendant or defendants did not deviate from the accepted standards of medical or nursing practice, then such defendant or defendants are liable for the plaintiff's increased injuries.

On the other hand, if you find that Aviv would have suffered the same injuries even if a defendant or defendants . . . did not deviate from accepted standards of medical practice, then such defendants are not liable to the plaintiff.

If you find that the plaintiff has proven that a defendant or defendants deviated from accepted standards of medical or nursing practice, and that the deviation increased the risk of harm posed by Aviv's preexisting condition, and was a substantial factor in producing the ultimate harm or injury, the plaintiff is not required to quantify or put a percentage on the

A-4953-17T1

extent to which the defendant[s'] deviation added to Aviv's final injuries.

In cases where a defendant or defendants' deviation accelerated or worsened the plaintiff's preexisting condition, such defendant or defendants are responsible for all of the plaintiff's injuries unless . . . such defendant or defendants are able [to] reasonabl[y] apportion the . . . damages.

If the injuries can be so apportioned, then such defendant or defendants are only responsible for the amount of the ultimate harm caused by the deviation attributable to them.

For example, if the defendant or defendants claim that Aviv had a risk of injury and/or death when he arrived at CentraState Medical Center because he was suffering from a severe allergic reaction, asthma and anaphylaxis. And that he had not used an EpiPen.

And if such defendant or defendants can prove that an apportionment can be reasonably made, separating those injuries that Aviv would have suffered anyway, even with timely treatment from the injuries that the plaintiff suffered due to the delay in treatment, then . . . such defendant or defendants are only liable for that portion or percentage of the injuries that a defendant proves is related to the delay in the treatment of Aviv's original condition.

On the other hand, if you find that the defendant has not met the defendant's burden of proving that the plaintiff's injury can be reasonably apportioned, then such defendant or defendants are responsible for all of the plaintiff's harm or injury.

A-4953-17T1

When you are determining the amount of damages to be awarded . . . to the plaintiff, you should award damages for all of the plaintiff's injuries. Your award should not be reduced by the percentages. The adjustment in damages which may be required, will be performed by the [c]ourt.

## F. Jury Verdict

On February 15, 2018, the jury returned a verdict in favor of plaintiffs and against Belnekar, finding she deviated from accepted standards of medical practice and the deviation had increased the risk of harm posed by Aviv's pre-existing conditions. The jury attributed eighty percent of Aviv's ultimate injury to his pre-existing condition and twenty percent to Belnekar's negligence. It concluded Belnekar was acting as an agent or employee of CentraState on June 3, 2014.[13] The jury found Licata and Dolcemascolo were not negligent.

In addressing damages, the jury awarded $200,000 for Aviv's "disability, impairment and loss of enjoyment of life," $50,000 for Aviv's pain and suffering, and $500,000 for Meir and Ilana's "loss of care, companionship, comfort, support, advice and guidance." After molding the verdict, the court entered

---

[13] As Belnekar was an employee of Central Jersey Emergency Medicine, defendants stipulated that any verdict against Belnekar would be molded to include a judgment against Central Jersey.

judgment in favor of plaintiffs of $466,547.04, plus taxed costs and post-judgment interest.[14]

## IV. Plaintiffs' Motion for a New Trial

In March 2018, plaintiffs moved for a new trial. They argued the trial court erred: 1) in "allowing defendants to repeatedly stress that Aviv and his parents . . . had not used the EpiPen prior to arriving at the hospital . . . without giving sufficient limiting instructions as required by Ostrowski v. Azzara"[15]; 2) in allowing "the issues of proximate cause and damages [to be] improperly influenced by the testimony of . . . Tversky, who should not have been allowed to testify because his opinions lacked any scientific basis and [were] net opinions"; 3) in "allowing [the] jury to apportion between Aviv's pre-existing condition and his ultimate injury pursuant to Scafidi v. Seiler"; 4) in dismissing Meir's emotional distress claim; and 5) in acting in a manner that "improperly influenced the jury to favor the defense." Plaintiffs asked for a new trial on the issues related to Dolcemascolo and Licata, and for an additur or new trial on damages.

---

[14] The molded verdict included the medical bills of $1,563,028.95 and pre-judgment interest.

[15] Ostrowski v. Azzara, 111 N.J. 429 (1988).

The trial judge denied the motion for new trial on March 9, 2018. In his oral statement of reasons presented on June 6, 2018, the judge reiterated his decision to permit the testimony regarding the nonuse of the EpiPen. He stated, "the failure to use the EpiPen . . . was entirely relevant on the issue of what percentage of Aviv's ultimate harm was caused by his pre-existing condition upon arrival in the emergency room [thirty] minutes after ingesting dairy and not having administered [e]pinephrine." The judge noted the expert testimony of Santucci, Greenberger, and Tversky, who all testified that the speed epinephrine is given "is the most important factor in determining outcome." Therefore, the non-use of the EpiPen was an issue of proximate cause to be determined by a jury.

The judge rejected plaintiffs' argument regarding defense expert Tversky. As he had concluded during the trial, the judge found Tversky's testimony was not a net opinion because he testified "within a reasonable degree of medical probability" and his opinions were properly supported.

Next, the trial judge addressed plaintiffs' argument that it was error to allow the jury to apportion between Aviv's pre-existing condition and his ultimate injury. The judge found, as he did during trial, that there was no case

law to support plaintiffs' argument and it was the jury's province to make a determination on the issue, using the evidence presented to them.

The trial judge declined to order a new trial regarding defendants Licata and Dolcemascolo. He found no reason to reconsider his decision permitting the testimony of defense expert Mikula, finding she was "properly qualified as an expert in emergency room nursing . . . basing [her] expert opinion on many years of specialized training."

The judge also rejected plaintiffs' application regarding the dismissal of Meir's emotional distress claim. He stated the claim was not supported under the applicable case law as discussed during trial. Meir could not equate his observations of Aviv turning blue or seizing with any negligence on defendants' part. Meir also had not supported his claim of the required severe emotional distress.

Plaintiffs requested the court grant an additur, asserting the $50,000 award for pain and suffering shocked the conscience. The judge disagreed, finding there was testimony before the jury that Aviv was conscious for only one to two minutes after the epinephrine was given. He stated the award was not "grossly inadequate or shocking." In considering the $200,000 award for disability, impairment, and loss of enjoyment of life, the judge found the award was not

grossly inadequate, and did not shock the conscience because the events of June 3, 2014 happened "within a very short time period" before Aviv fell into a vegetative state.

Finally, the judge discussed at length plaintiffs' contentions that he "improperly influenced the jury." He concluded the arguments lacked merit.

V. The Appeal

Before this court, plaintiffs allege judicial error in: 1) allowing the jury to apportion the damages between Aviv's pre-existing condition and his ultimate injury; 2) dismissing Meir's emotional distress claim; 3) allowing defendants to emphasize the non-use of the EpiPen; 4) improperly barring photographs, video, and testimony; 5) not barring the testimony of Licata and Dolcemascolo's expert witness as a net opinion; and 6) not granting an additur or a new trial.

In a cross-appeal, Belnekar and Central Jersey Emergency Medicine Associates contend the trial court erred by improperly barring the admission of certain evidence at trial. Defendants condition their cross-appeal on whether this court finds merit in plaintiffs' arguments and grants an additur or a remand for a new trial.

A trial judge "shall grant" a motion for a new trial "if, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses,

41

it clearly and convincingly appears that there was a miscarriage of justice under the law." R. 4:49-1(a). "This standard applies whether the motion is based upon a contention that the verdict was against the weight of the evidence, or is based upon a contention that the judge's initial trial rulings resulted in prejudice to a party." Hill v. N.J. Dep't of Corr., 342 N.J. Super. 273, 302 (App. Div. 2001) (citing Crawn v. Campo, 136 N.J. 494, 510-12 (1994)). "On appeal, we consider essentially the same standard." Ibid. (citing R. 2:10-1). If there was legal error during the trial, we also accord deference to the trial judge's evaluation of the prejudice that resulted, and whether that prejudice contributed to an unjust result. Ibid. (citing Crawn, 136 N.J. at 512).

Plaintiffs contend several errors require a new trial. We consider each issue in turn.

## A. The Scafidi argument

Plaintiffs steadfastly maintained throughout the trial that a Scafidi apportionment charge was not warranted; they asserted Scafidi was inapplicable to the facts here. On appeal, plaintiffs refine their argument, contending that because defendants' experts failed to provide the jury with a specific percentage apportionment between Aviv's pre-existing condition and defendants' negligence, defendants must be responsible for all of plaintiffs' damages.

42

Conversely, defendants contend New Jersey case law does not require them to provide the jury with an exact percentage and that they apportioned Aviv's damages through expert testimony that opined Aviv's "[risk of] lost chance [was] at 100%."

Generally, traditional negligence elements apply in a medical malpractice case. Verdicchio v. Ricca, 179 N.J. 1, 23 (2004). A plaintiff must prove through expert testimony: 1) the applicable standard of care, 2) a deviation from the standard, and 3) that the deviation proximately caused the injury. Ibid. (citation omitted).

In a malpractice case in which the plaintiff's injury can be traced to a single cause, the traditional "but for" test, i.e., assessing whether the injury would not have occurred but for the wrongful act, is applied to determine causation. Ibid. (citation omitted). However, the "but for" test can be unsuitable where two or more actions "operate to bring about a certain result and 'any one of them operating alone would be sufficient.'" Id. at 24 (citation omitted). In those circumstances, our Supreme Court has adopted an alternate "substantial factor" test. Ibid. (citation omitted). Under this analysis, the fact-finder must decide whether the "defendant's deviation . . . increased a patient's risk of harm or diminished [the] patient's chance of survival and whether such increased risk

43

was a substantial factor in producing the ultimate harm." Ibid. (citation omitted).

In Scafidi, the Court applied this test to circumstances where a patient was treated for a pre-existing condition,[16] and a physician's negligence allegedly worsened that condition. 119 N.J. at 108. The Court recognized that, in such a situation, it may be difficult to identify and prove the precise injury caused solely by the physician. Ibid. As the Court explained:

> Because this modified standard of proximate causation is limited to that class of cases in which a defendant's negligence combines with a preexistent condition to cause harm . . . the jury is first asked to verify, as a matter of reasonable medical probability, that the deviation . . . increased the risk of harm from the preexistent condition. Assuming that the jury determines that the deviation increased the risk of harm from the preexistent condition, we [then] use the "substantial factor" test of causation . . . .
>
> [Id. at 108-09 (citations omitted).]

Thus, a typical Scafidi situation involves a plaintiff who sought treatment for a pre-existing condition, and a defendant health professional negligently

---

[16] "A preexistent condition or disease is one that has become sufficiently associated with a plaintiff prior to the defendant's negligent conduct . . . ." Anderson v. Picciotti, 144 N.J. 195, 211 (1996) (citation omitted).

either failed to diagnose or improperly treated the condition, causing it to worsen. See Komlodi v. Picciano, 217 N.J. 387, 415 (2014).

Once a jury determines that a defendant's negligence was a "substantial contributing cause of plaintiff's injury, plaintiff is entitled to recover damages." Koseoglu v. Wry, 431 N.J. Super. 140, 158 (App. Div. 2013) (citing Verdicchio, 179 N.J. at 25). However, a defendant is only responsible for the portion of the harm attributed to his or her negligent conduct. Ibid. (citation omitted). "The defendant bears the burden of demonstrating apportionment of damages between his conduct and any pre-existing condition. If a defendant fails to present proof supporting apportionment, the jury is 'entitled . . . to hold him 100% liable for the [plaintiff]'s losses.'" Ibid. (alterations in original) (citations omitted). We stated further that "the nature and quantum of evidence . . . need not be ample or precise." Ibid. (citation omitted).

A "defendant need not produce proofs 'amounting to scientific or mathematical precision as to how much each [causal factor] contributed in percentage points to [the] ultimate death.'" Ibid. (alterations in original) (quoting Poliseno v. Gen. Motors Corp., 328 N.J. Super. 41, 60 (App. Div. 2000)). However, although a defendant has the "burden of segregating recoverable damages from those solely incident to the preexisting disease,"

Anderson, 144 N.J. at 212 (quoting Fosgate v. Corona, 66 N.J. 268, 273 (1974)), the Court has recognized the increase in risk resulting from a negligent act may be "unquantifiable." Ibid. (quoting Evers v. Dollinger, 95 N.J. 399, 406 (1984)).

Here, all of the experts agreed Aviv presented to the emergency department with the pre-existing conditions of an allergic reaction or anaphylaxis and asthma. Moreover, the experts agreed Aviv's pre-existing condition was a factor in assessing his lost chance for recovery. Therefore, plaintiffs' argument during the trial that Scafidi was inapplicable lacked merit.

We turn then to a consideration of whether defendants met their burden in apportioning the damages to support a Scafidi charge. Defendants' expert, Tversky, opined that Aviv was at a higher risk of having a poor outcome because of his severe dairy allergy and asthma. Aviv's medical history, combined with the nonuse of his EpiPen upon eating the cookie, as well as the progression of his symptoms between the ingestion of the dairy and his arrival at the hospital, placed him at a greater risk than the average patient for a poor outcome. Essentially, defendants argued Aviv's pre-existing conditions and the failure to use the EpiPen were 100% of the cause of his ultimate injury.

Plaintiffs' experts conceded that the prompt injection of an EpiPen when symptoms first begin is essential to treatment of an allergic reaction and, in this

46

situation, its non-use increased Aviv's risk of harm. Greenberger agreed that the failure to give epinephrine as soon as symptoms appear has been identified in medical literature as the most important factor contributing to death from anaphylaxis.

We disagree with plaintiffs' assertion that defendants failed to sustain their burden of apportionment. Defendants presented expert testimony to the jury, attributing 100% of the damages to Aviv's pre-existing conditions and nonuse of the EpiPen. The jury was free to accept or reject that testimony. The jury's determination that only 80% of Aviv's ultimate harm was caused by his pre-existing condition did not signify defendants had not met their burden of apportionment. To the contrary, the verdict reflected the jury's careful consideration of the evidence and its understanding of the court's instructions. As we stated in Koseoglu,

> [T]he jury took "a more moderate position than propounded by either of the parties," and chose to "accept or reject so much of each side's evidence as it found credible or not credible." The jury's partial rejection of defendant's evidence does not mean defendant failed to meet her burden of proof on the issue of apportionment. Rather, it reflects the jury's diligent response to the court's proper instructions to discern whether the ultimate outcome would have occurred had defendant not been negligent. The jury exercised its responsibility to consider all evidence, fix

credibility, accept or reject the testimony presented, and decide all material issues of fact.

[431 N.J. Super. at 163 (citation omitted).]

We are satisfied the trial judge properly instructed the jury on proximate cause. The judge tracked model jury charge 5.50E, modifying it to the facts of this case as required. Defendants presented expert testimony allocating the risk of harm entirely to Aviv's pre-existing condition and nonuse of the EpiPen, therefore, sustaining their burden of apportionment. The jury followed the instructions and made a well-reasoned decision, supported by the evidence, on the proximate cause issue.

### B. References to Prior Allergic Reactions

Plaintiffs argue defendants improperly questioned Ilana and Meir on Aviv's prior allergic episodes because those episodes were irrelevant to the issue of proximate cause. They contend the questions "tainted the jury's evaluation of [plaintiffs'] damages." Defendants assert Aviv's nonuse of his EpiPen was relevant to the issue of proximate cause because it diminished his chance of survival. Furthermore, defendants contend they did not blame Aviv for not using his EpiPen, and the jury was not asked to determine any comparative negligence on the part of plaintiffs.

As stated, prior to opening statements, plaintiffs' counsel moved to prevent defendants from "blaming" Aviv and his parents for not using the EpiPen before he went to the hospital on June 3, 2014. The judge instructed defendants they could not argue that Aviv or his parents bore any fault for the events.

When defense counsel questioned Ilana about Aviv's prior allergic episodes, plaintiffs objected again, asserting any testimony regarding prior reactions was irrelevant. The judge permitted the inquiry, finding it was relevant to the issue of proximate cause.

On appeal, citing Ostrowski, plaintiffs contend the judge erred in permitting the testimony. We disagree, finding Ostrowski distinguishable from the facts here. The Ostrowski Court stated: "The pre-treatment health habits of a patient are not to be considered as evidence of fault that would have otherwise been pled in bar to a claim of injury due to the professional misconduct of a health professional." 111 N.J. at 444.

The testimony regarding the nonuse of the EpiPen was not offered as evidence of fault under comparative negligence principles. The judge gave the jury a limiting instruction with guidance as to how they could consider the testimony. In addition, defense counsel told the jury in closing arguments

A-4953-17T1

defendants were not claiming Aviv, or his parents, were at fault for the tragic circumstances.

The early administration of epinephrine to an anaphylactic patient was the central issue in this case. Plaintiffs contended defendants were negligent in failing to administer the proper dosage in the proper location and in failing to give Aviv additional doses when his symptoms did not abate. As we have already noted, all of the experts agreed the early administration of epinephrine was the most important factor in treating Aviv's allergic reaction.

It was undisputed that Aviv did not use his EpiPen on June 3, 2014. The information that Aviv ingested a dairy product to which he was allergic and that he had not used his EpiPen in the thirty minutes prior to his arrival at the emergency department were crucial facts upon which defendants determined their course of treatment. Belnekar ordered the epinephrine and the nurses injected Aviv with it within minutes of seeing him in the critical care room.

In addition, evidence of the nonuse of the EpiPen was relevant to the issue of proximate cause. Tversky found the nonuse, in combination with other pre-existing conditions, affected Aviv's survivability. The information was required for the experts and jury to assess how much harm defendants' malpractice caused Aviv in comparison to his pre-existing conditions.

A-4953-17T1

We also discern no error in the questioning regarding Aviv's prior allergic episodes. Again, the information demonstrating the severity of Aviv's allergy and the family's routine in responding to the reactions was necessary to defendants' course of treatment and the experts' assessment of the June 3, 2014 episode.

## C. The Trial Judge's Evidential Rulings

Plaintiffs also contend a new trial is required because the trial judge erred in barring certain photographic, video, and testimonial "evidence of Aviv's injuries during the three-year period from the time of [defendants'] negligence until his death." Plaintiffs sought introduction of this evidence during Ilana's direct testimony.

After defendants objected to the photographs and video of Aviv taken after his transfer from CentraState, plaintiffs asserted "the photographs and video were also relevant to Meir['s] . . . Portee[17] claim." As a result, the trial judge advised plaintiffs' counsel he could re-introduce the items during Meir's testimony, and he would rule on the admissibility of the evidence at that time. However, plaintiffs did not re-introduce the exhibits during Meir's testimony.

_____

[17] Portee v. Jaffee, 84 N.J. 88 (1980).

Therefore, there is no merit to their argument that the evidence was improperly barred.

Ilana described for the jury how she cared for Aviv while he was at St. Peter's and later at the Voorhees long-term care facility. Plaintiffs' counsel also sought to elicit testimony from Ilana regarding her observations of Aviv and her belief that Aviv was experiencing pain and discomfort in his vegetative state. Defendants objected, arguing that Ilana's testimony "call[ed] for medical opinion on whether or not Aviv was . . . medically capable of experiencing pain or showing a reaction to activities that were taking place in his [hospital] room." Because plaintiffs did not have an expert to establish Aviv had any level of consciousness to feel pain or suffering, the judge determined Ilana's lay testimony was "emotional speculation" and inadmissible.

As a lay witness, Ilana was permitted to testify about her observations. See Rule 701. However, plaintiffs sought to introduce Ilana's interpretations of her observations. She believed Aviv was "upset," "restless," and showed "resistance" during her interactions with him. But plaintiffs did not have an expert to connect Ilana's testimony with any medical evidence that Aviv was suffering or experiencing pain or that he was even medically capable of suffering or feeling pain.

As a layperson, Ilana did not have the "sufficient expertise" to conclude Aviv could experience feelings such as being "upset" or "restless." Such testimony required an expert with "specialized knowledge." Rule 702. Therefore, Ilana's testimony was speculative and was properly barred by the trial court as inadmissible under N.J.R.E. 701 and 403.

Furthermore, a jury may only consider damages for conscious pain and suffering. See Lewis v. Read, 80 N.J. Super. 148, 174 (App. Div. 1963) (finding "conscious suffering is the only proper basis for pain and suffering"); accord Eyoma v. Falco, 247 N.J. Super. 435, 450-51 (App. Div. 1991). Here, Ilana sought to express her belief that Aviv was experiencing pain after he was in a vegetative state. As this testimony is speculative, it cannot be used to assess damages for Aviv's pain and suffering. See Model Jury Charges (Civil), 1.12(O), "Damages" (approved Nov. 1998).

D. Meir's Emotional Distress Claim

Plaintiffs contend it was error to dismiss Meir's emotional distress claim. We disagree.

In Frame, our Supreme Court established the standard for an indirect claim for emotional distress in a medical malpractice action. 115 N.J. at 643-50. The Frame standard modified the bystander liability principles first articulated in

Portee. The Frame Court stated: "In an appropriate case, if a family member witnesses the physician's malpractice, observes the effect of the malpractice on the patient, and immediately connects the malpractice with the injury, that may be sufficient to allow recovery for the family member's emotional distress." 115 N.J. at 649.

We also turn to the Court's guidance provided in Gendek. There, the plaintiffs filed an action for negligent infliction of emotional distress as a result of the fatal illness of their infant son, who developed respiratory problems and stopped breathing the day after his birth. 139 N.J. at 292-93. Although medical personnel resuscitated him, the child suffered severe brain damage as a result of the loss of oxygen. Life support was removed forty-five days after birth and the infant died. Id. at 295. The defendants' motion for summary judgment on the emotional distress claim was granted. Ibid.

The Court affirmed the grant of summary judgment and reiterated that a cause of action arises for the negligent infliction of emotional distress where a person is a direct object of a tortfeasor's negligence and experiences severe emotional trauma. Id. at 296. It further opined that recovery in medical malpractice cases is permitted only where the family member witnesses the

alleged malpractice, observes the effect, and immediately connects the malpractice with the injury. Id. at 301.

In Gendek, at the crucial times, neither parent observed the alleged malpractice. When the infant initially stopped breathing, one of the parents was not even present at the hospital. Id. at 294. The Court found that neither parent immediately connected the child's respiratory failure with an act of medical malpractice, or medical malpractice with the need to perform emergency procedures. Id. at 301-02.

Here, plaintiffs alleged that the act of malpractice was initially defendants' failure to administer the correct dosage of epinephrine, and to administer it in the proper location, then the failure to give additional doses of the drug. In his testimony, Meir described defendants' malpractice as Belnekar's and the nurses' lack of urgency in attending to Aviv. He stated that no one cared for Aviv for more than thirty minutes after they arrived at CentraState. Furthermore, Meir admitted he did not witness Aviv receiving the epinephrine injection. Therefore, under Gendek and Frame, Meir did not witness the acts of malpractice plaintiffs alleged against defendants. His emotional distress claim was properly dismissed.

E. The Judge Erred in Permitting the Expert Testimony of Nurse Mikula

Plaintiffs assert that Mikula's opinion on the standard of care applicable to emergency room nurses treating anaphylactic patients was "based solely on her own personal experience" with "no external objective standard" and, therefore, the opinion should have been barred as net opinion. Again, we disagree.

N.J.R.E. 702 and 703 frame the analysis for determining the admissibility of expert testimony. Rule 702 requires three standards to be met for the admission of expert testimony:

> "(1) the intended testimony must concern a subject matter that is beyond the ken of the average juror; (2) the field testified to must be at a state of the art such that an expert's testimony could be sufficiently reliable; and (3) the witness must have sufficient expertise to offer the intended testimony."
>
> [Creanga v. Jardal, 185 N.J. 345, 355 (2005) (quoting Kemp ex rel. Wright v. State, 174 N.J. 412, 424 (2002)).]

Rule 703 instructs that expert opinions must be "grounded in 'facts or data derived from (1) the expert's personal observations, or (2) evidence admitted at the trial, or (3) data relied upon by the expert which is not necessarily admissible in evidence but which is the type of data normally relied upon by experts.'"

Townsend v. Pierre, 221 N.J. 36, 53 (2015) (quoting Polzo v. Cty. of Essex, 196 N.J. 569, 583 (2008)).

A net opinion is an expert's conclusion that is not supported by factual evidence or other data. Experts must "give the why and wherefore" to support their opinions, "rather than . . . mere conclusion[s]." Id. at 54 (quoting Borough of Saddle River v. 66 E. Allendale, LLC, 216 N.J. 115, 144 (2013)). An expert must "explain a causal connection between the act or incident complained of and the injury or damage[s] allegedly resulting therefrom." Buckelew v. Grossbard, 87 N.J. 512, 524 (1981). Expert testimony that is "based merely on unfounded speculation and unqualified possibilities" should be barred. Vuocolo v. Diamond Shamrock Chems. Co., 240 N.J. Super. 289, 300 (App. Div. 1990).

However, an expert may ground an opinion in his or her personal experience and training. See State v. Townsend, 186 N.J. 473, 495 (2006); Rosenberg v. Tavorath, 352 N.J. Super. 385, 403 (App. Div. 2002) ("Evidential support for an expert opinion is not limited to treatises or any type of documentary support, but may include what the witness has learned from personal experience."). Additionally, an opinion is not rendered a net opinion simply because it may be subject to attack on cross-examination for not including other meaningful considerations. Rosenberg, 352 N.J. Super. at 402

(citing <u>Rubanick v. Witco Chem. Corp.</u>, 242 N.J. Super. 36, 55 (App. Div. 1990)); <u>see also</u> <u>Glowacki v. Underwood Mem'l Hosp.</u>, 270 N.J. Super. 1, 16-17 (App. Div. 1994) (declining to strike an expert's testimony as a net opinion as "[a]ny shortcoming in his method of analysis was explored and it was for the jury to determine the weight his opinion should receive").

Mikula is a certified emergency room nurse. She described her educational background and the specific training she has "deal[ing] with patients with severe allergic reactions or anaphylaxis." Mikula testified about the multiple emergency rooms she worked in during her more than twenty-five years treating patients as an emergency room nurse. During that time, Mikula became "familiar" with the "standards of care that are applicable to an emergency room nurse[] caring for a patient with anaphylaxis . . . ." After establishing she had sufficient credentials to testify as an expert in her field of practice, Mikula offered her opinion as to the standard of care based on her experience as an emergency room nurse in multiple hospitals.

During cross-examination, plaintiffs' counsel asked Mikula what she relied on in forming her opinions. She responded that her opinions were based on her professional experience as a nurse in several emergency departments.

We are satisfied Mikula did not offer an impermissible net opinion. She grounded her opinions on her professional experience as an emergency room nurse in multiple hospitals, as well as her education and training. It is permissible for an expert to base her opinion on her training and professional experience. See Townsend, 186 N.J. at 495; Rosenberg, 352 N.J. Super. at 403 (finding an expert's "fail[ure] to cite any treatises, articles, protocols or the like in support of his opinion [did not] render it a net opinion"). Plaintiffs' counsel properly probed Mikula's credentials and the basis for her opinion during cross-examination. But her opinions were supported by her education, training, and experience and, therefore, were properly admitted. See Glowacki, 270 N.J. Super. at 16-17.

## F. The Damage Award

Plaintiffs contend the damage award of $50,000 for Aviv's pain and suffering and $200,000 for his disability, impairment, and loss of enjoyment "shocks the conscience."

Our review of a damages award is the same as the trial court's. Cuevas v. Wentworth Grp., 226 N.J. 480, 501 (2016). We do not disturb the jury's award "unless it is 'so disproportionate to the injury and resulting disability as to shock the conscience and [convince the court] that to sustain the award would be

manifestly unjust.'" Ming Yu He v. Miller, 207 N.J. 230, 249 (2011) (alteration in original) (quoting Baxter v. Fairmont Food Co., 74 N.J. 588, 604 (1977)). "A jury's verdict, including an award of damages, is cloaked with a 'presumption of correctness.'" Cuevas, 226 N.J. at 501 (quoting Baxter, 74 N.J. at 598). That presumption is not overcome unless the party "clearly and convincingly" establishes that the award represents a "miscarriage of justice." Ibid. (quoting Baxter, 74 N.J. at 596); see also R. 4:49-1(a).

However, in reviewing the trial court's determination, we "must pay some deference to [the] trial judge's 'feel of the case.'" Ibid. (quoting Johnson v. Scaccetti, 192 N.J. 256, 282 (2007)).

In its survival action, plaintiffs were entitled to damages for the pain and suffering Aviv experienced while conscious. N.J.S.A. 2A:15-3; Smith v. Whitaker, 160 N.J. 221, 236 (1999); Carey v. Lovett, 132 N.J. 44, 67 (1993). Here, defendants presented evidence that Aviv was only conscious for one to two minutes after receiving the initial dose of epinephrine.

As to Aviv's loss of enjoyment of life, plaintiffs described Aviv having missed his graduation from high school, senior prom, and beginning college. We are not persuaded the $200,000 verdict was "shockingly low." In affording the required deference to the trial judge's determination, we cannot conclude

that plaintiffs have "clearly and convincingly" demonstrated a miscarriage of justice. See Cuevas, 226 N.J. at 501. We see no reason to disturb the damage award.

In defendants' cross-appeal, they asserted the trial court erred in barring certain records from admission at trial. However, defendants "conditioned" their appeal on the grant of an additur or a new trial. Having found no merit in plaintiffs' appellate arguments, we need not consider the issues raised in the cross-appeal.

Affirmed on the appeal; the cross-appeal is dismissed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4953-17T1